**XEROX CORPORATION**

v.

**The UNITED STATES.**

**Nos. 420–72, 212–74.**

United States Court of Claims.

July 29, 1981.

H. Stewart Dunn, Jr., Washington, D. C., attorney of record, for plaintiff; Michael F. Solomon and Ivins, Phillips & Barker, Washington, D. C., of counsel.

Kenneth R. Boiarsky, Washington, D. C., with whom was Acting Asst. Atty. Gen., John F. Murray, Washington, D. C., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and SMITH, Judges.

## OPINION

### PER CURIAM:

This is an investment credit tax case in which Trial Judge Thomas J. Lydon has rejected one branch of taxpayer's argument but allowed recovery on its alternative contention. The case comes before us on both parties' exceptions to different parts of the trial judge's opinion and findings, as well as defendant's exception to the recommended conclusion of law. Oral argument has been had and the court has also considered the briefs and record.

We adopt Trial Judge Lydon's comprehensive opinion with the deletion of his discussion of the Government's setoffs and counterclaim.[1] Nothing need be added to Part I, A, of that opinion (rejecting taxpayer's claim that its arrangements, if considered leases, were short-term leases and its machines therefore entitled to investment-credit status). On the second issue (whether the machines were entitled to investment-credit status because they were not leased but supplied as an integral part of a service) which the trial judge decided for taxpayer, we add the following paragraphs on certain aspects of that issue. Our judgment rests both on the trial judge's opinion (as adopted by us) and on the supplementary discussion in this *per curiam* opinion.[2]

On the "service" question it is well to stress, at the outset, that, although the statute and the regulations do not say that property made available as an integral part of a service is entitled to "section 38" status (assuming that that property would not have that status if leased), the Internal Revenue Service has developed that position and defendant does not quarrel with it in any way. The only controverted issue before us is whether taxpayer's machines fell (in the taxable years) within that category. In deciding that single question, we have the right to consider the Service's rulings, both formal and informal, in the light of the facts we have found on this record.[3] Having adopted and maintained the "service" doctrine, the IRS cannot now disavow it because it leads to the taxpayer's result if one accepts, as we do, the trial judge's appraisal of the particular facts after a full trial. Nor can the Government now arbitrarily limit the doctrine in ways not properly foreshadowed in the Service's own formulation of it.[4]

There is no need to list or summarize the several facts and factors which the trial judge has carefully weighed in his thorough discussion. But it does not denigrate from his opinion to add that a significant element which leads us to affirm and adopt his view that these were service arrangements is that this is *not* a case in which the cost or value of the machine itself overwhelmingly dominates the price of the total arrangement. It appears (using the instances of

---

1. Both sides are agreed that, if we hold (as we do) that plaintiff is entitled to the investment credit it claims, we need not consider the defendant's affirmative defenses.

2. We adopt the trial judge's findings of fact 1–27 with the modifications indicated in our separate order issued this date. We do not print the findings because this opinion gives the facts necessary for an understanding of the decision. Additional facts stated in this opinion, but not contained in the formal findings, are to be considered as additional findings of fact.

3. Though private letter rulings have no precedential force, they are helpful, in general, in ascertaining the scope of the "service" doctrine adopted by the Service and in showing that that doctrine has been regularly considered and applied by IRS. *Cf. Rowan Companies, Inc. v. United States*, —— U.S. ——, at —— n.17, 101

S.Ct. 2288, at 2296–2297 n.17, 68 L.Ed.2d 814 (1981).

4. For instance, the first ruling adopting the service exception, Rev.Rul. 68–109, 1968–1 C.B. 10 (the telephone switchboard matter), applied the doctrine to switchboards and dial switching apparatus operated by personnel of the customer on the latter's premises—and it is therefore very difficult to accept defendant's present argument that the service principle cannot ever be applied where the customer's own personnel operate the machines (even though a service arrangement was in fact made).

Conceivably the matter could be different if a regulation formulated the precise confines of the service exception, but there is no such regulation applicable to this case. See our discussion *infra*.

two of the important machines) that the cost of a separate full maintenance agreement would be from 26%–36% of the cost of the full copy service; but this maintenance charge does not include training, risk of loss, retrofits (of which there were a goodly number), "like-for-like" exchanges, and the other aspects of full service. If those other aspects of full service (additional to maintenance) were included, there would be a substantial additional percentage of the total cost of the arrangement which is not attributable to the cost or value of the machine itself. The large portion of the total cost allocable to aspects other than the machine itself is an important element (in addition to the matters set forth by the trial judge) in our holding that this was a service arrangement.

Defendant emphasizes the specific inclusion in Treas.Reg. § 1.48–1(k) (1964) of "a data processing or copying machine which is leased to any such governmental unit" as not eligible for "section 38" treatment (*see* Part I of the trial judge's opinion, *infra*). But this reference to a "copying machine" is carefully limited to those "leased" to a government unit (or tax-exempt organization), and we do not understand the reference as restricting application of the service exemption to copying machines which are not leased but are made available as an integral part of a service arrangement. As the trial judge points out (Part I, B, at note 21, *infra*), Rev.Rul. 71–397, 1971–2 C.B. 63, which rejected the service exception for this plaintiff, did so on the basis that the machines were in fact leased (a conclusion we reject on the present record) and not on the specific reference in the regulation to a "copying machine."

Finally, we state explicitly, though it should not be necessary to do so, that our ruling in this case is based on the present record, and the evaluation of that record by the trial judge and by us,[5] and that we lay down no general rule for other copying machines or for other machines (*e. g.* data processing machines, word-processors, etc.) supplied to governments or tax-exempt organizations. Those cases must rest on their own varied arrangements and their own particular facts.

On the basis of the foregoing discussion and the trial judge's opinion (which together constitute the court's opinion) as well as the findings, the court holds that plaintiff is entitled to recover.

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge:

In these two cases, plaintiff seeks refunds of federal income taxes in the amounts of $257,164, $263,093, and $439,417 for the calendar years ended December 31, 1964, 1965, and 1966, respectively, plus interest thereon as provided by law.[1] Plaintiff's claim is based on the contention that it was entitled to an investment tax credit on copying machines it placed with the federal government, state and local governments, and tax-exempt organizations during those years under various contractual arrangements. Defendant maintains that plaintiff is not entitled to the investment tax credit claimed. Alternatively, defendant raises two setoff defenses and a related counterclaim involving only calendar year 1966.

During the tax years in issue, and since at least 1960, plaintiff manufactured various types of copying, duplicating, and printing machines (hereinafter machines). Although these machines were available for purchase by all customers, most of the machines produced by plaintiff during the

---

5. In this connection, the court rejects defendant's point that the trial judge erroneously excluded evidence sought to be introduced by defendant after trial, as well as defendant's exceptions to the trial judge's findings of fact and most of plaintiff's exceptions.

1. The cases now under consideration were consolidated for purposes of all further proceedings by order dated October 11, 1974, on the representation that common questions of law and fact were involved. Similar investment tax credit claims were filed by plaintiff on March 26, 1972, for calendar years 1967 and 1968 (Ct.Cl. No. 86–75) and November 17, 1975, for calendar year 1969 (Ct.Cl. No. 399–75). Proceedings in these later filed cases have been suspended pending decision on the investment tax credit issue in the consolidated cases.

years in issue were placed with customers under various contractual agreements which for convenience purposes will be referred to hereinafter as rental agreements.

Plaintiff's machine models were manufactured to single standard specifications, i. e., there was no differentiation among machines of the same model number. The machines were deemed to be completely fungible and, on manufacture, were available to all commercial, governmental, and tax-exempt customers of plaintiff alike.

During the years in issue, the federal government obtained machines from plaintiff under rental agreements entitled "Xerographic Machine Rental Service." During this same period, state and local governments, tax-exempt organizations, and all other customers of plaintiff obtained machines from plaintiff under rental agreements which were variously entitled "Xerox Copy Service Agreement," "Xerox Duplicating Service Agreement," and "Xerox Print Service Agreement." [2]

The federal government obtained machines from a manufacturer (contractor) such as plaintiff on the authority of a master contract negotiated between the contractor and the General Services Administration acting through its Federal Supply Service (GSA).[3] GSA was responsible for determining the machine needs of the various federal offices, departments and agencies, which determinations were reflected in a "solicitation for offers" which was presented to the market place. After receiving offers from contractors, GSA negotiated with those contractors in order to obtain for the federal government the best possible prices and terms relative to obtaining machines. An award to a contractor embracing negotiated prices and terms was embodied in a master contract. A master contract was an indefinite quantity type contract in that a contractor was not obligated to provide nor the federal government to obtain any machine unless a specific purchase order was placed therefor by a particular federal office, department or agency. While the terms of a master contract permitted the federal government to cancel the same on 60 days' notice to the contractor, there is no evidence that this right was ever exercised during the years in issue.[4] No federal office, department, or agency could obtain machines by reason of the execution of a master contract alone. Purchase orders were utilized by various

2. During trial and in their briefs, the parties were at pains to attack the characterizations each placed on and/or drew from these agreements and other business documents. Plaintiff stresses the word "service" and downplays the words "machine" and "lease" whenever and where ever they appear. Defendant, on the other hand, emphasizes the words "machine" and "lease" at every turn and downplays the word "service." It has been said many times that one must look to the substance of a transaction, for the true nature of any such arrangement cannot be altered by mere contractual formalisms or party characterizations. *Burstein v. United States*, 622 F.2d 529, at 537 (Ct.Cl.1980); *Hooker Chemicals and Plastics Corp. v. United States*, 219 Ct.Cl. ——, ——, 591 F.2d 652, 658 (1979).

3. Plaintiff's principal machine competitors during the years in issue included Smith Corona Marchant, the 3–M Company, Eastman Kodak and Bruning. The record suggests that there were some variations in terms and prices between the master contracts GSA negotiated with plaintiff and the master contracts GSA negotiated with other contractors. The record, however, indicates that plaintiff was the primary supplier of machines to the federal government during the years in issue. While the federal government was plaintiff's largest single customer, this customer source constituted only 5 or 6 percent of the total machine population of plaintiff in place with all customers at any particular time during the 1964–1966 period.

4. Purchase orders for machines, as well as the master contracts under which they were authorized, generally expired at the end of the federal government's fiscal year. Machines acquired under purchase order during the course of a fiscal year and not cancelled or terminated prior to the end of said year, in practice were continued in place under renewal purchase orders based on the authority of the next fiscal year's master contract. There is no evidence that this transitional process, during the years in issue, caused any problems to either plaintiff or the federal government since plaintiff continued to be awarded master contracts during this period. It is fair to say that during the years in issue there was general continuity in the rental agreements entered into by the parties.

federal offices, departments and agencies not only to obtain machines but also for the maintenance and/or repair of said machines or for the purchase of supplies, e. g., paper, toner, film remover, etc.

A master contract established for various federal offices, departments and agencies the basic prices, terms and conditions under which plaintiff, during the years in issue, provided machines to the federal government. Plaintiff prepared an "Authorized Federal Supply Schedule Price List" (Price List) for each fiscal year covered by a master contract. The Price Lists represented plaintiff's distillation of the basic prices and terms of the master contract. Although they did not reflect the entire contents of a master contract, the Price Lists were designed to contain pertinent information a federal office, department or agency would need to obtain, by purchase order, machines from plaintiff. The terms of a purchase order were ostensibly consistent with the terms set forth in the applicable Price List, and the submission of a purchase order to plaintiff by a federal office, department, or agency finalized the commitment of plaintiff and the federal government to the contractual agreement entitled "Xerographic Machine Rental Service." [5]

Rental agreements with non-federal government customers (i. e., state and local governments, tax-exempt organizations and commercial customers) were entered into on forms provided by plaintiff during the years in issue. These forms, sample copies of which were available and are in the record, generally consisted of two pages and contained the prices, terms, and conditions applicable to placement by plaintiff of machines on the premises of non-federal government customers.

Generally, a customer, when contracting with plaintiff for placement of a copying machine on its premises, would request a particular model machine.[6] In the case of the federal government, as indicated earlier, the request for a machine was made by means of a purchase order which would include thereon the GSA master contract number and the catalog number, where applicable, of the desired machine model. Pertinent provisions of the rental agreements utilized in the placement by plaintiff of machines with governmental and tax-exempt organizations during the years in issue will be considered when the litigating positions of the parties are discussed, infra. Usually, plaintiff paid the cost of placing the machine on the customer's premises except that local delivery and rigging costs, if any, were generally borne by the customer. Plaintiff bore the expense of return transportation of the machine to it.

## I

The question for decision in these cases is whether plaintiff is entitled to an investment tax credit for machines manufactured and placed by it during the years in issue on the premises of various governmental units and tax-exempt organizations under rental agreements.

The investment tax credit was first enacted as part of the Revenue Act of 1962, Pub.L.No.87–834, 76 Stat. 960, 26 U.S.C. §§ 38, 46–48 (1964). The purpose of this tax credit was stated to be as follows:

> The objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities

5. Neither party retained copies of the master contracts or the purchase orders utilized during the years in issue. The parties seem to agree, however, that the terms of the purchase orders were consistent with the terms set forth in the Price Lists issued during those years. Price Lists for the government's fiscal years July 1, 1963, through June 30, 1967, were available and are part of the record in these cases.

6. If this was the customer's initial request for a machine, the request presumably would not include the machine's serial number since the serial number of said machine would ordinarily not be known to a customer at that time. However, if the request was to renew an agreement for a machine already in place, the serial number of said machine was undoubtedly set forth in said request. The serial number was utilized in identifying machines for, inter alia, payment purposes, e. g., where the number of copies produced by a particular machine per month was an integral part of the monthly rental charge.

and thereby improve the economic potential of the country, with a resultant increase in job opportunities and betterment of our competitive position in the world economy. The objective of the credit is to reduce the net cost of acquiring new equipment; this will have the effect of increasing the earnings of new facilities over their productive lives and increasing the profitability of productive investment.[7]

S.Rep.No.1881, 87th Cong., 2d Sess., *reprinted in* [1962] U.S.Code Cong. & Ad.News 3297, 3304, 3314 (hereinafter S.Rep.No. 1881). With the above purpose in mind, it would appear that in the case of property which is manufactured by a taxpayer for lease to others, the benefit of a lower acquisition cost attributable to the credit hopefully would be reflected in a lower lease price which in turn hopefully would stimulate demand for the leased item.

Section 38 of the Internal Revenue Code of 1954, as amended, provided a direct credit against income tax liability for a taxpayer's investment in certain depreciable property used in its trade or business.[8] The amount of said credit was determined by reference to Code section 46 which, during the years in issue, provided, with limited exception, for a credit equal to 7 percent of the taxpayer's "qualified investment" as the term was defined in that section. The amount of "qualified investment" is a percentage of the basis of each section 38 property placed in service during the taxable year. The applicable percentage is determined by the useful life of the property. Section 38 also directed the Secretary of the Treasury or his delegate to prescribe such

regulations as may be necessary to carry out the statutory investment tax credit provisions.

Property which qualifies for an investment credit is referred to as "section 38 property," a term which is defined by section 48. Generally, section 38 property encompasses depreciable "tangible personal property" used by a taxpayer in a trade or business "with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more." Section 48(a)(1).

The machines in issue were tangible personal property and had useful lives of at least 5 years. Without more, these machines would seem to constitute section 38 property. However, section 48 sets forth certain exclusions from the definition of "section 38 property." For purposes of these cases, attention will focus on the exclusions set forth in section 48(a)(4), which excludes "property used by certain tax-exempt organizations," and section 48(a)(5) which excludes "property used by governmental units."

Sections 48(a)(4) and (5) provide in pertinent part:

(4) *Property used by certain tax-exempt organizations.* Property used by an organization * * * which is exempt from the tax imposed by this chapter shall be treated as section 38 property only if such property is used predominantly in an unrelated trade or business the income of which is subject to tax under section 511.[9]

---

**7.** Since the investment tax credit was designed to stimulate economic growth by providing the business community with an immediate inducement to invest in plants and equipment, its availability during times of inflation ran counter to this purpose. Accordingly, during inflationary times, Congress has seen fit to suspend and/or terminate the availability of the investment tax credit. *See e. g.,* 80 Stat. 1514 where the investment tax credit originally was suspended during the period October 10, 1966—December 31, 1967, but thereafter restored on March 9, 1967, 81 Stat. 57; the investment credit was terminated for property acquired

after April 18, 1969, 83 Stat. 660; and restored for property whose construction was completed after August 15, 1971, or begun after March 31, 1971, 85 Stat. 498.

**8.** Unless otherwise noted, all statutory references in this opinion are to the Internal Revenue Code of 1954, as amended, and state the applicable provisions in force during the years in issue.

**9.** This exclusion prevents the use of a credit for property acquired in connection with a tax-exempt function from reducing the tax attributa-

(5) *Property used by governmental units.* Property used by the United States, any State or political subdivision thereof, any international organization, or any agency or instrumentality of any of the foregoing shall not be treated as section 38 property.[10]

Treasury regulations, as directed by section 38, were subsequently issued by the Secretary. Treas.Reg. § 1.48–1(k) (1964) applicable to section 48(a)(5) reads as follows:

(k) *Property used by governmental units.* The term 'section 38 property' does not include property used by the United States, any State (including the District of Columbia) or political subdivision thereof * * *. The term 'property used by the United States, etc.' means (1) property owned by any such governmental unit (whether or not leased to another person), and (2) property leased to any such governmental unit. Thus, for example, a data processing or copying machine which is leased to any such governmental unit would be considered as property used by such governmental unit. Property leased by another person to any such governmental unit or leased by such governmental unit to another person is not section 38 property to either the lessor or the lessee * * *. This paragraph shall not apply to property leased on a casual or short-term basis to any such governmental unit.

Substantially identical language is used in the Treasury regulation applicable to section 48(a)(4), i. e., Treas.Reg. § 1.48–1(j) (1964) ("Property used by certain tax-exempt organizations"). The only difference, in essence, between subparagraph (k) and (j) is a clause in subparagraph (j) stating that the regulation does not apply to property "used predominantly in an unrelated trade or business" of a tax-exempt organization. In other words, a tax-exempt organization would not be entitled to an investment credit on property it uses in its tax-exempt function, the income of which is not subject to income tax, but it would be entitled to such a credit if the property were used by it in an unrelated non-tax-exempt business, the income of which is subject to federal income tax.[11]

Defendant maintains that the machines leased to governmental units and tax-exempt organizations in these cases are not section 38 property. Plaintiff contends that, if its contractual agreements are deemed to constitute leasing arrangements, the machines were leased on a short-term basis, and thus, under the Treasury regulations, cited *supra*, entitled to be considered section 38 property. The first issue as framed by the parties is whether the machines in question were leased on a short-

ble to a non-exempt unrelated trade or business of the organization, S.Rep.No.1881, 87th Cong., 2d Sess., *reprinted in* [1962] U.S.Code Cong. & Ad.News 3304, 3319 (hereinafter S.Rep.No. 1881). The technical explanation of the bill also indicates that "property used by a tax-exempt organization" is meant to include property leased to such an organization. *Id.* at 3439, 3459. The language "used by" is presumably intended to be consistent for both governmental entities (section 48(a)(5)) and tax-exempt organizations although the rationales for the two exclusions are different, and in the case of property leased by a tax-exempt organization, the purpose of the exclusion for property used by such organizations could have been accomplished simply by prohibiting a pass-through of the credit which is otherwise allowed pursuant to Code section 48(d).

10. The rationale for providing that property produced for lease to a governmental unit should not qualify for the investment credit rests on the belief that the reduction in price, which is expected as a result of the credit, would not cause any corresponding increase in demand for the property by a governmental unit and presumably would not result in increased production. S.Rep.No.1881, 87th Cong., 2d Sess., *reprinted in* [1962] U.S.Code Cong. & Ad.News at 3319. In essence, governmental demand was viewed as inelastic, i. e., not dependent on price.

11. The parties, at trial and in their briefs, centered their presentations predominantly on rental agreements involving governmental units, principally the federal government. Accordingly, it is only deemed necessary to set forth herein that portion of the regulations dealing with property used by governmental units since the import and thrust of the regulations relating to both governmental units and tax-exempt organizations are significantly the same.

term basis. As a second string to its liability bow, plaintiff argues that it was not leasing machines to governmental units and tax-exempt organizations but was providing a service to them. If, plaintiff's argument continues, the machines are part of a service, the machines are not "used by" governmental units and tax-exempt organizations within the purview of the applicable statutory provisions and related Treasury regulations cited above which preclude treating property "used by" governmental units and tax-exempt organizations as section 38 property. The second question raised by the parties is whether plaintiff was providing a service and thus was not leasing property to governmental units and tax-exempt organizations during the years in issue.

### A

The literal language of Code sections 48(a)(4) and (5) can be read to suggest that any use of property of whatever duration by a governmental or tax-exempt entity would be enough to make said property ineligible for the investment credit. However, Treas.Reg. §§ 1.48–1(j) and (k) preclude any such restrictive reading of these sections. There is no contention by the parties that these regulations are inconsistent or in conflict with the governing statutory provisions. *See generally, United States v. Calamaro,* 354 U.S. 351, 358–59, 77 S.Ct. 1138, 1143–1144, 1 L.Ed.2d 1394 (1957); *see also Lovett v. United States,* 621 F.2d 1130, at 1135 (Ct.Cl.1980).

While Treas.Reg. §§ 1.48–1(j) and (k) accord with the legislative history of the investment tax credit by defining "property used by governmental entities" to include property leased to governmental entities, *see* S.Rep.No.1881, 87th Cong.2d Sess., *reprinted in* [1962] U.S.Code Cong. & Ad. News 3304, 3319, the regulations carve out an exception to the credit exclusion stated therein by providing that property "leased on a casual or short-term basis" will be eligible for the credit.[12] There is no claim by plaintiff that the rental agreements in issue were "casual" leases.[13] Plaintiff's professed contention is that its rental agreements were, if deemed leases, "short-term leases."

As noted in *World Airways, Inc. v. Commissioner,* 564 F.2d 886, 888 (9th Cir. 1977), *aff'g* 62 T.C. 786 (1974), the problem with the issue at hand is the absence in case law or applicable regulation of a definition of the language "short-term" as used in Treas. Reg. §§ 1.48–1(j) and (k).[14] In the *World Airways, Inc.* case, where the lease of an aircraft to the federal government was not considered to be "short-term," the court

---

12. Despite the fact that a copying machine is cited in these regulations as an example of leased property not entitled to the credit, there is no reasonable basis for concluding that a copying machine leased on a "short-term basis" is not within the scope of the exception to said exclusion set forth in the same regulations. To exclude copying machines from the "short-term" exception of the regulations would invite inconsistency within the regulations. *See United States v. Calamaro,* 354 U.S. 351, 359, 77 S.Ct. 1138, 1143–44, 1 L.Ed.2d 1394 (1957); *see also Fruehauf Corp. v. United States,* 201 Ct.Cl. 366, 380, 477 F.2d 568, 575–76 (1973) (Davis, J., concurring).

13. By "casual lease" the regulations presumably contemplate a lease which lacks the formalities inherent in a written lease. *See* Rev. Rul. 71–397, 1971–2 C.B. 63. Another example might be the lease of an automobile from a car rental company by a government employee traveling on government business. While it may be argued that the vehicle, strictly speaking, is being used by the government, it seems doubtful that section 48(a)(5) was intended to preclude the rental company from taking an investment credit on said vehicle under such circumstances.

14. Plaintiff, relying on imprecise encyclopedia definitions, suggests that a lease which is relatively limited in duration should be classified as a short-term lease. One cannot quarrel with such a bland generalization. Plaintiff also refers to other provisions of the Code (e. g., section 263 dealing with the useful life of acquired assets relative to capital expenses) and certain amended investment tax credit regulations, (adopted on August 24, 1972 (Treas.Reg. § 1.48–4(a)(2) to implement Pub.L.No.92–178 § 108(c), 85 Stat. 507–08 (1971)), which obviously were not in existence during the tax years in issue. None of these materials have been found helpful in meeting the question posed by the regulations in force during the years in issue.

offered the following rationale for the inclusion of the "short-term" language in these regulations.

Section 1.48–1(k) of the Regulations recognizes that the government often has unforeseen or extraordinary needs which it satisfies by obtaining the use of property under "casual" or "short-term" leases from the private sector—that is, from taxpayers who are able to temporarily forego the use of their Section 38 [26 U.S.C. § 38] property for the convenience of the government. If such a lease to the government would cause the taxpayer to lose the credit, such property would not be available to the government on a lease basis, or would force the taxpayer to require a rental payment of an amount sufficient to compensate the taxpayer for the loss of the credit. It is, therefore, reasonable to allow, by regulation, a taxpayer to lease Section 38 property to the government for a short time without causing the taxpayer to lose the credit. * * * [564 F.2d at 888.]

During the years in issue, most rental agreements between plaintiff and its customers allowed customers to cancel the agreement on 15 days' advance written notice.[15] These cancellation provisions in the rental agreements involving governmental and tax-exempt organizations provide the cornerstone for plaintiff's argument that the agreements in issue had a *de jure* term equal to the length of notice required for cancellation and, thus, must be considered short-term leases.

The ability to cancel rental agreements undoubtedly was an important feature of said agreements. It provided the customer

with available flexibility in meeting its current copying, duplicating and printing needs. The reasons for cancelling rental agreements varied, *e. g.*, centralization (smaller satellite machines cancelled in favor of a larger, more productive machine) or decentralization (smaller satellite machine replacing one larger machine), dissatisfaction, upgrading to a faster, more productive machine, availability of funds, competition from other machine manufacturers, etc. Obviously, when a customer wanted to get rid of a machine, regardless of the length of time it had the machine, it would exercise its cancellation right under the rental agreement. In this context, it would seem apparent that the cancellation right may have been exercised frequently over a period of years, a fact stressed by plaintiff. Plaintiff argues that the frequency of cancellation, which was evidenced by its estimate that one-third of its total machine population was cancelled during the course of any year, proves that the *de facto* duration of its leases was short-term.

Plaintiff contends that the *de jure* obligation of the rental agreements, and the *de facto* duration of said agreements both indicate that they were short-term. These contentions are not found to be persuasive.

Plaintiff's reliance on the cancellation provision *per se* as fixing the term of the lease is misplaced. Regardless of the fact that a customer might not have been obligated to retain the machine for any period longer than that necessary for giving notice of cancellation, both parties to a rental agreement realistically contemplated a much longer duration period than 15 days.[16]

---

15. The advance notice period required for cancellation was longer for certain machines. For example, rental agreements with the federal government for the Copyflo, the 1820 printer, and the 1860 printer machines required 30 days' written notice for cancellation. Rental agreements with non-federal government customers involving the 1860 printer machine, and some rental agreements involving the 1824 printer machine provided for an initial term of 90 days with customer cancellation allowed either at the end of the 90-day term or thereafter upon 30 days' written notice; other rental

agreements involving 1824 printer machines required 90 days' written notice for cancellation.

16. While in a different tax context, this court has rejected the substance of plaintiff's basic argument that because of the 15-day cancellation provisions it can have no expectation of its machines remaining with its customers beyond a 15-day period at the time of initial placement. *See Swank v. United States*, 221 Ct.Cl. ——, 602 F.2d 348 (1979), *aff'd, United States v. Swank*, —— U.S. ——, 101 S.Ct. 1931, 68 L.Ed.2d 454 (1981); *Bakertown Coal Co. v. United States*, 202 Ct.Cl. 842, 847–48, 485 F.2d

It is noted that the federal government's master contracts and attendant purchase orders were not the products of unforeseen or extraordinary needs, the rationale for the "short-term" lease language articulated by *World Airways, Inc. v. Commissioner, supra.* In *Stewart, IV v. United States,* 40 AFTR 2d 77–5735, 77–5737 (D.Neb.1977) the district court, in denying an investment credit claim relating to vehicles provided the Post Office Department under contracts which the taxpayer claimed were short-term leases, held that the minimum enforceable duration of the lease did not control the question of whether or not the lease was short-term, but that the actual duration of use of the property in question was controlling. In my opinion this holding by the district court is correct. Accordingly, plaintiff's contention that, as a matter of law, a 15-day cancellation clause in a rental agreement on a copying machine with a useful life of 5 years is a "short-term" lease cannot be accepted.

Plaintiff's argument that, in fact, the duration of use of its machines during the years in issue was "short-term" is not supported by the record. The fact that plaintiff was faced with frequent cancellations by its customers such that an estimated one-third of its entire machine population was cancelled during the course of any year does not address the vital question of how long any particular machine remained in place with a customer.[17] The record indicates that there was substantial variety in the duration of machine placements. Some machines remained with the same customer for 3 years or more. Other machines re-

mained with customers for shorter periods of time. The testimony at trial suggests, however, that on average, machines remained in place, for more than a year with the same customer. Thus, while it is obviously impossible to state with precision the *de facto* duration of each rental agreement, the totality of the record supports a finding that generally machine placements with governmental units and tax-exempt organizations, during the years in issue, were not "short-term" in any realistic appreciation of those words. Plaintiff has failed to establish that governmental and tax-exempt use of its machines was of "short-term" duration during the years in issue. This is a burden that properly rests on plaintiff in a tax refund suit. *See E. I. du Pont de Nemours & Co. v. United States,* 221 Ct.Cl. ——, ——, 608 F.2d 445, 453–54 (1979), *cert. denied,* 445 U.S. 963, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980); *Monfore v. United States,* 214 Ct.Cl. 705, 721 (1977).

Plaintiff also seeks to establish that its agreements were "short-term" leases by offering its rationale of the purpose of the exception in the regulations for "short-term" leases. Plaintiff, of course, claims its rental agreements fall within the pale of this rationale that it proffers for consideration. As previously noted, the purpose of the investment credit was to stimulate production. This purpose, it was felt, was not accomplished in the case of property produced for lease to the government because government demand is presumably inelastic, that is, not responsive to the price reduction that theoretically results from the

633, 636 (1973). Further, the fact that the customer was required to install adequate wiring for machine use and that customer employees were to be trained by plaintiff in machine operation supports the realistic duration views attributed to the parties herein. *See* Rev.Rul. 71–397, 1971–2 C.B. 63, 64.

17. Plaintiff's Federal Marketing Manager, the source of the one-third cancellation estimate, testified, for example, that a machine could have been with a customer for 5 years and thereafter cancelled under the 15-day cancellation provision. Such a cancellation statistic was included in the yearly one-third cancellation estimate on which plaintiff places so much

reliance. There was testimony that on certain, rare occasions machines were cancelled within 4 months of placement. The testimony reflected only one recalled incident in which a machine was cancelled within 15 days of initial placement; and that cancellation, 2 days after placement, resulted from a malfunctioning machine which plaintiff replaced with another machine. Under the circumstances of record, plaintiff's one-third yearly cancellation estimate is of doubtful value in ascertaining the duration of use of machines by governmental and tax-exempt entities during the years in issue.

taxpayer's reduced production costs. According to plaintiff, even without the investment credit, government demand for leased property will be met when a taxpayer justifiably can expect the revenue from government use to cover a significant portion of the cost of the leased property. Based on the foregoing, plaintiff argues that the investment credit will be necessary to stimulate production in those instances in which anticipated government use would be insufficient to cover a significant portion of the cost of the property. Plaintiff contends, therefore, that the regulations must be interpreted to include within the meaning of "short-term" any lease to a governmental unit in which the taxpayer cannot anticipate the recovery of a substantial portion of its costs. Plaintiff concludes that its own rental agreements must be viewed as "short-term" because the 15-day cancellation provision in the rental agreements meant that plaintiff could not anticipate that the government's use would be of sufficient duration to allow it to recover a substantial portion of its cost of producing a copying machine. Plaintiff ignores in this approach the crucial matter of the actual duration of use by the government of the machines during the years in issue.

■ Plaintiff's rationale for the regulation in question assumes that Congress intended to provide either the incentive of the investment credit or some alternative economic benefit in all circumstances. Nothing in the regulations, the statute itself, or its legislative history indicates that this is the case. A more plausible view of the exception in the regulations which permits property leased on a "short-term" basis to qualify for the investment credit is, as set forth previously, to assure that property not ordinarily intended for lease to a governmental entity or tax-exempt organization is available for a short period to such an entity in unforeseen or extraordinary circumstances. See *World Airways v. Commissioner, supra,* 564 F.2d at 888; *Stewart, IV v. United States, supra,* 40 AFTR 2d at 77–5736. The totality of the contractual arrangements between plaintiff and its governmental customers during the years in issue does not comport with this purpose of the regulation's "short-term" exception to the credit exclusion.

Even assuming arguendo that plaintiff's rationale for the regulation has merit, plaintiff's argument is effectively disposed of by the evidence of record which indicates that the actual duration of rental agreements was usually in excess of 1 year. Because, as previously noted, the parties must have contemplated that the actual duration of the agreements would be considerably longer than 15 days, plaintiff must have anticipated that a substantial portion of its costs would, in fact, be recovered over the duration of the agreement. Plaintiff continued to solicit machine rental agreements from governmental units and tax-exempt organizations year after year and it is unreasonable, from a business point of view, to assume it would continue to do so if it were not at least recovering a substantial portion of its costs on machines so leased. There is no factual basis in the record to support the proposition, vital to plaintiff's argument, that governmental and tax-exempt use of plaintiff's machines during the years in issue was insufficient to cover a significant portion of the cost of said machines.

Plaintiff presents two alternative arguments for consideration if its primary position that its rental agreements were "short-term" leases is rejected. Plaintiff's first alternative argument is that it is entitled to investment credit on machines placed with governmental units and tax-exempt organizations during the years in issue, with defendant entitled to recapture said credit, under section 47(a)(1), if it is later determined that actual use of these machines was other than "short-term." The core of plaintiff's argument here is that it is entitled to at least 15 days' investment credit on each machine and credit for each additional day of use up to the point where it is determined the duration of use converts it into a long-term use sufficient to remove it from section 38 property status. It has already been determined that it has not been shown that these machines were used

on a "short-term" basis. Further, it is plaintiff's burden to establish that the machines were used on a "short-term" basis, not defendant's burden or the court's burden to prove they were used on a substantial or long-term basis. See Young & Rubicam v. United States, 187 Ct.Cl. 635, 644, 410 F.2d 1233, 1238 (1969).

Plaintiff's second alternative argument that some machines were placed on a "short-term" basis, in fact, and thus should be entitled to the investment credit is equally without merit. On this record, the extent to which machines remained with a customer during the years in issue for specified and deliberate short periods of time, e. g., under 4 months, were de minimis. Moreover, such evidence as is in the record on the matter of deliberate use of machines for particularized short periods of time is most generalized, and in one recalled specific instance outside the pale of the years in issue. Since records to support such a claim are no longer available (see note 5, supra), plaintiff suggests that experience under more current rental agreements (1977–1979) be utilized to reach a percentage figure that could be applied to the 1964–1966 years in issue. Underscoring plaintiff's suggestion is its view that the current monthly rental plan (cancellation on 30 days' notice) is a "short-term" lease when compared with current optional alternative plans available to customers which require a customer to retain a machine for a fiscal year (or remaining part thereof) or a two fiscal year period. Plaintiff concedes that

these latter plans are not "short-term" agreements. Plaintiff views the current monthly plan as equivalent to the 15-day provision in the 1964–1966 rental agreements in issue, and argues that it should at least receive the investment credit in those past years in the same ratios that machines are currently obtained from plaintiff under the monthly plan. Again, plaintiff completely ignores the concept found acceptable herein that actual duration of use of the property rather than the minimum enforceable duration of the lease is the controlling factor. It is plaintiff's burden to establish the details necessary for a determination that it is entitled to the credit for the 1964–1966 years in issue. See Young & Rubicam v. United States, supra. In any event, the use of data generated by 1977–1979 rental agreements, which differ in certain respects from the rental agreements in issue, as a basis for allowance of an investment credit on 1964–1966 transactions is not deemed particularly persuasive or relevant.

While the facts in World Airways, Inc. v. United States,[18] supra, and Stewart, IV v. United States, supra, differ to some degree from the facts in these cases, the holdings in those cases, rejecting claims for "short-term" designation of leases by which property was made available for governmental use, fully support the conclusion reached herein that plaintiff's copying machines were not made available to governmental units and tax-exempt organizations during the years in issue on a "short-term" basis.[19]

18. Even if one were receptive to plaintiff's alternative argument relative to certain machines which were placed specifically in anticipation of short periods of use, e. g., ad hoc conference work, there is no showing, and it is doubtful if any such showing could be made at this time for 1964–1966 machines, as to the subsequent use of these machines. Such subsequent use might well prove significant. If these particular machines were immediately thereafter placed with other governmental units or tax-exempt organizations, the duration of governmental and/or tax-exempt use obviously would be enlarged. If these machines were placed with customers other than governmental units or tax-exempt organizations, and the governmental and tax-exempt use was short-term as argued by plaintiff—the machines would not

lose their status as section 38 property. The point is the matter is not as simple as plaintiff would like one to believe.

19. Plaintiff feels these two decisions are significantly different from the cases at bar. Plaintiff stresses, for example, that in both cited cases the property in question was purchased explicitly to fulfill contracts already executed with the federal government. However, this seems immaterial since the crucial fact is how long the property was used by the federal government, not the purpose for which the property was acquired. This observation is also responsive to plaintiff's contention that the 15-day cancellation provision in the instant cases was substantially shorter than the cancellation provisions available in the cited cases. Other dis-

## B

As indicated previously, sections 48(a)(4) and (5) of the Code provide, in essence, that property "used by" tax-exempt organizations and governmental units "shall not be treated as section 38 property." Plaintiff agrees that property which is leased to tax-exempt organizations and governmental units, under other than a "casual or short-term basis," is "used by" these entities and thus excluded from entitlement to the investment tax credit. However, plaintiff urges, as an alternative ground for recovery herein, that its machines were not "used by" those entities during the years in issue within the meaning of the above-mentioned Code sections because the machines were made available to these customers as part of a service.

The non-applicability of sections 48(a)(4) and (5) to property provided to a customer as part of a service is not mentioned in the statute itself, its legislative history, or the regulations implementing it. Rather, this exception owes its genesis to Rev.Rul. 68–109, 1968–1 C.B. 10, and its continuing vitality to subsequent published and private rulings by the Internal Revenue Service (IRS). Plaintiff relies on certain of these Revenue Rulings to establish the scope of the "service" exception and to identify the factors which, plaintiff argues, demonstrate that its rental agreements fall within this exception.[20]

Rev.Rul. 68–109, *supra*, involved switchboards or dial switching apparatus installed by a public utility on the premises of tax-exempt organizations and governmental units. IRS held that the equipment was not property "used by" governmental and tax-exempt customers within the meaning of sections 48(a)(4) and (5), and accordingly, was not precluded from qualifying for the investment credit. IRS relied on the fact that the taxpayer retained all ownership in and possession and control over the equipment in finding that the taxpayer's agreements with its customers were not sales or leases but service contracts. In addition, IRS noted that the taxpayer's business was governed by tariffs on file with the Federal Communications Commission and with state regulatory agencies which did not authorize sale or lease by the taxpayer of the property in question. IRS expressed no concern in this ruling as to the facts that the customer supplied its own employees to operate the switchboard or dial switching apparatus and that the equipment was located on the premises of the customers.

The question of whether vending machines located on the premises of governmental units and tax-exempt organizations could qualify as section 38 property was addressed in Rev.Rul. 70–313, 1970–1 C.B. 9, a ruling not referred to by either party but

---

tinctions between the cited cases and the cases at issue raised by plaintiff are not deemed significant enough to detract from the view that the conclusions reached in the cited cases comport with the conclusion reached in the cases *now being considered.*

**20.** Revenue Rulings state the general position of the Internal Revenue Service (IRS) on tax matters. While these rulings are not binding on the Secretary of Treasury or the courts, they may be helpful in interpreting a statute. Revenue Rulings do not have the effect of a regulation or a Treasury Decision. *See Pacific Far East Line, Inc. v. United States,* 211 Ct.Cl. 71, 93, 544 F.2d 478, 490 (1976). Revenue Rulings may, however, influence the course of a decision. *See Capital Savings & Loan Assoc. v. United States,* 221 Ct.Cl. ——, —— – ——, 607 F.2d 970, 974–75 (1979). There is no contention by defendant that this Revenue Ruling "service" exception to the credit exclusion of property "used by" tax-exempt organizations

and governmental units is inconsistent or in conflict with the governing Code sections, *see* text, *supra. See also Dixon v. United States,* 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965). The IRS ostensibly believed that Congress did *not intend for* Code sections 48(a)(4) and (5) to be applied restrictively especially if the announced exception does not work against the purpose of the investment credit provisions, *see Lykes Bros. S.S., Inc. v. United States,* 206 Ct.Cl. 354, 375, 513 F.2d 1342, 1353 (1975); and, to hold otherwise, might result in property not being available to the government, *see World Airways, Inc. v. Commissioner,* 564 F.2d 886, 888 (9th Cir. 1977). The parties, instead, center their arguments on whether the rental agreements in question more nearly resemble contracts to provide a service, plaintiff's position, or more properly should be classified as leases, defendant's contention.

cited in other rulings discussed hereinafter. These vending machines were placed pursuant to simple, generally unwritten, agreements which variously provided that the organization could purchase from the taxpayer all items used in the vending machine without any payment to the taxpayer for use of the machines; or pay the taxpayer a stipulated price per month per machine and purchase all items sold from the taxpayer; or permit the taxpayer to place the machines on the premises and service (maintenance and repair) and collect the money therefrom. Generally, the organization would derive some income from the operation of the machines. IRS emphasized that the machines were primarily for the personal use of the organization's employees and were not deemed used directly in performing a governmental or tax-exempt function. The IRS held that the vending machines were not precluded from qualifying as section 38 property, reasoning that although the rental agreements might technically be leases, they more nearly resembled simple contracts which transferred no legal interest in the machine to the customer and in fact allowed the taxpayer discretion to remove the machines or transfer them to another location. This ruling did not, however, refer to the agreements specifically as "service" contracts.

In Rev.Rul. 71–397, 1971–2 C.B. 63, which involved plaintiff and the very "service" exception issue now under consideration, the IRS ruled that rental agreements under which machines were placed with tax-exempt organizations and governmental units were not service contracts, and the copying machines provided pursuant thereto could not qualify as section 38 property. After summarizing the terms of the agreements, and the applicable regulations the ruling concluded that the agreements were in the nature of a lease because the taxpayer "gives up possession and use of the machines on a month to month term while retaining title and all other incidents of ownership;" and that "[t]he placing of the machines with a user for payment of a monthly charge plus an amount for each unit produced enables the user to provide services for himself." Rev.Rul. 68–109, *supra*, was distinguished on the ground that "the placing of communication equipment with the purchaser of communication services is inherent in the sale of such services for which the parties contracted." 1971–2 C.B. at 64.[21]

The nature of the "service" exception was elaborated upon further in Rev.Rul. 72–407, 1972–2 C.B. 10, which was not cited by plaintiff but was referred to by defendant, in which the taxpayer requested advice as to whether vehicles supplied to a government department for daily use would qualify as section 38 property. The vehicles were furnished pursuant to standard form contracts in which the taxpayer agreed to provide fully serviced vehicles, including gasoline, oil, repairs and other maintenance, but did not provide drivers. Payment was made at the end of stated periods and was

---

21. Defendant argues that Treas.Reg. §§ 1.48–1(j) and (k), which lists a copying machine leased to governmental units and tax-exempt organizations as an example of property "used by" such entities, is sufficient, without more, to support denial of plaintiff's "service" exception claim. It is to be noted that Rev.Rul. 71–397 did not base its adverse ruling on this regulation and the example cited therein, although it set out the substance of this regulation in the ruling, and an inference fairly drawn from this omission in the ruling is the belief that the IRS position was that the copying machines in question would be entitled to the credit if they were placed with customers under "service" agreements. There is no explanation of why the drafter of the regulation included copying machines as an example therein. Defendant's *ad terrorem* approach that to allow the credit in these cases would open the availability of the credit to all copying machines and thus effectively emasculate the regulation example as to copying machines is not deemed persuasive. Contrary to defendant's assertion, the record in this case indicates that machines were provided governmental and tax-exempt entities by other contractors under agreements different from those here in issue (*see* note 3, *supra*). Thus, it may well be that in other situations, machines may have been, in fact, leased to these entities and thus not entitled to the credit. If, however, machines, in fact, were placed with these entities as part of a service, then under Revenue Rulings such property would be entitled to the investment credit.

based on the actual number of days or hours of vehicle use.

The IRS stated in Rev.Rul. 72–407 that the vehicles could not qualify as section 38 property, and noted that the situation was similar to that in Rev.Rul. 71–397, *supra*, in which IRS determined that the taxpayer had given up possession of the property, and had placed it with the user to enable the user to provide a service for itself. Rev.Rul. 68–109, *supra*, was distinguished on several grounds. IRS noted that the taxpayer in Rev.Rul. 68–109 retained all ownership in and possession and control over the equipment in question; the nature of the services therein was regulated by tariffs on file with governmental agencies which did not authorize the sale or lease of the property; and the equipment therein was part of an integrated network used to render service to the customer, not property placed with a user to allow it to provide services to itself.

Plaintiff also relies on several private (unpublished) letter rulings in support of its contention that it falls within the pale of the "service" exception.[22] In Ltr. 7829066 (April 21, 1978) the IRS concluded that television sets placed on the premises of tax-exempt hospitals for use by patients would qualify as section 38 property. The hospital allowed the taxpayer to place television sets in hospital rooms for paid use by patients and retained a portion of the proceeds, remitting to the taxpayer an amount determined by the daily number of occupied beds. The taxpayer retained ownership and control of the property at all times; it was solely responsible for installation, maintenance and repair of the equipment and it held a right of access to the property to perform those functions. Hospital employees were not allowed to work with, repair or move the sets. A television set removed for repair would be replaced by another set, with no requirement that the repaired set be returned to the same hospital. In this letter ruling IRS noted that the property

was for the personal use of the hospital's patients, and emphasized that the contract provided that the property was to remain the property of the taxpayer at all times, a situation similar to Rev.Rul. 70–313, *supra*, but not noted as such by IRS. According to IRS, Rev.Rul. 72–407, *supra*, and Rev.Rul. 71–397, *supra*, were distinguishable because the property provided to the users in those rulings was not used to provide a service, but to allow the user to provide services to itself.

The second letter ruling proffered by plaintiff, Ltr. 7847075 (August 28, 1978), involved the question of whether a constellation of communications satellites and related ground control equipment could qualify as section 38 property. The satellite system was to be developed in response to a government bid request which specified the frequencies, quality and duration of satellite communication required by the government, but not the name, type, or number of satellites or related ground control equipment. The bid request referred to the proposed contract as a service contract and provided that the contractor would own, maintain, and operate the system with payment to be made on a monthly basis for satisfactory services, with no separate charge for operation, maintenance or equipment. The bid request also allowed the contractor to provide concurrent services to commercial customers, with all services to be offered pursuant to FCC tariffs which did not authorize sale or lease of the equipment. On the basis of the principles set forth in the published revenue rulings discussed, *supra*, IRS concluded that the satellite system could qualify as section 38 property. This conclusion was based on the government agency's lack of possession and control over the system; the fact that the taxpayer at all times retained ownership of the system and was responsible for maintenance and control; the fact that the taxpayer bore the risk of loss during the ser-

**22.** As to private letter rulings generally, *see Shakespeare Co. v. United States*, 182 Ct.Cl. 119, 128, 389 F.2d 772, 777 (1968), *cert. denied*, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970);

*International Business Machines Corp. v. United States*, 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied*, 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966).

vice period; and the fact that the system was available to commercial users.

In the third, and final, letter ruling referred to by plaintiff, Ltr. 7913003 (November 28, 1978), IRS ruled that a pipeline constructed and operated by the taxpayer to transport natural gas from a tax-exempt organization's gas fields to its electric generating plant could qualify as section 38 property. IRS once again observed that in determining whether an agreement is a lease or a service contract, the focus must be, as it was in both Rev.Rul. 71–397 and Rev.Rul. 72–407, on whether the owner of the property utilizes such property to provide a service to another party or whether the property is provided to another party who uses such property to provide services to itself. Under the "Pipeline Service Contract," the taxpayer retained title and all other incidents of ownership in the property (pipeline), was responsible for all risk of loss, and was completely responsible for the cost of the complete operation and maintenance of the pipeline. The customer was to monitor the flow of natural gas to its electric generating facilities and to advise the taxpayer when any changes were required in the delivery schedule of available natural gas supplies. IRS, in ruling that the arrangement was a service contract and not a lease, stressed that the pipeline never left the possession or control of the taxpayer; that risk of loss was on the taxpayer; that if there was an equipment breakdown, the customer's obligations under the contract were suspended until such time as the equipment was ready for use; and that the taxpayer did not provide the pipeline to the customer to provide itself with the service of transporting its natural gas.

The published and private letter rulings discussed above do not articulate any single test which one could utilize to determine whether a given agreement is a service arrangement or a lease for investment credit eligibility purposes. It is apparent that any such determination must be made on an *ad hoc* basis. However, several factors surfaced in the rulings which IRS deemed common to service contracts sufficient to distinguish them from leases. While these factors overlap in some respects, they generally relate to two broad areas: first, the nature of the possessory interest retained by the taxpayer; and second, the degree to which the property supplied a customer is a component of an integrated operation in which the taxpayer has other responsibilities.

The cited rulings indicate that the following factors relative to the possessory interest retained by the taxpayer in the property were deemed relevant by IRS to a determination that a service arrangement existed: (1) retention of property ownership by the taxpayer, *see* Rev.Rul. 68–109, *supra*; Ltr. 913003, *supra*; Ltr. 7847075, *supra*; (2) retention of possession and control of the property by the taxpayer, *see e. g.*, Rev.Rul. 68–109, *supra*; Rev.Rul. 71–397, *supra*; Ltr. 7829066, *supra*;[23] (3) retention of risk of loss by the taxpayer, *see e. g.*, Rev.Rul. 68–109, *supra*; Ltr. 7847075, *supra*; Ltr. 7913003, *supra*; (4) reservation of the right to remove the property, and replace it with comparable property, *see* Ltr. 7829066.

Such "service arrangement" factors, *supra*, are in harmony with the definitions of "lease" in the treatises which are cited by plaintiff, and not disputed by defendant. For example, Professor Casner's treatise states:

[P]ossession is the main feature which distinguishes a lessee's interest * * *. Possession, of course, is a variable term which may mean different things for different purposes but it does imply physical control and intention to exclude others. Whether a particular instrument or set of facts results in a transfer of possession, and so is a lease, depends on the intention of the parties as determined by a con-

---

23. Although this requirement is referred to merely as possession and control in the Revenue Rulings, in fact it properly embraces also the right to exercise possession and control, rather than just actual physical possession. In Rev.Rul. 68–109, 1968–1 C.B. 10, for example, IRS found that the taxpayer retained possession and control of switchboards although they were located on government property and operated by government personnel.

struction of their language or acts * * *. Hence, what the parties call the transaction is important, but non conclusive.[24] [A. J. Casner, 1 American Law of Property § 3.3 (1952).]

Thus, in a lease, the customer (lessee) acquires a legal interest of some specified duration in the property itself, which enables it to exercise substantial control over the property including the right to deny access to others including the owner. By contrast, a service contract typically allows the owner access to its property and the right to freely substitute property in order to meet its contractual obligations.

The second area of focus used by IRS in determining whether an agreement is a service involves the degree to which the property is part of an integrated operation. In this area, IRS has drawn a distinction between property used by the taxpayer to provide services to its customer, and property placed with the customer to allow it to provide services to itself, see Rev.Rul. 71–397, supra; Rev.Rul. 72–407, supra. Further, IRS distinguishes between the placement of property which is inherent in the nature of the sale of such a service and that which is not, see Rev.Rul. 71–397, supra, citing Rev.Rul. 68–109. These cryptic distinctions are difficult to appreciate in the context of the totality of the revenue rulings under consideration. In the light of this record, however, these distinctions are not found persuasively significant.

With these revenue rulings in mind, attention must now be directed to the rental agreements in issue. An examination of plaintiff's rental agreements and the actual experience of the parties indicates that, although the task of determining whether the rental agreements in issue constituted a service or a lease is difficult, and a very close question, the totality of the record preponderates in favor of holding that plaintiff was providing a service.

The record establishes that the possessory interest retained by plaintiff in machines placed with its customers was substantially the same as the possessory interests found to be significant factors in the cited rulings in which a service was found. The rental agreements expressly provided that plaintiff retained ownership of the machines (including supplies such as drums and brushes, whose replacement cost was borne by the customer). Plaintiff, under these agreements, was responsible for the risk of machine loss or damage (except when attributable to the customer's willful, and sometimes negligent acts). Further, the 15-day cancellation provision also placed a certain economic risk on plaintiff. The agreements provided that customers were not allowed to make any machine alterations, and also required plaintiff's permission for any movement of the machines from the location at which they were placed by plaintiff on the customer's premises.[25] Under the

24. As indicated previously (see note 2, supra) the parties have pursued a "label" argument approach. Plaintiff stresses that the rental agreement captions include the word "Service." Defendant emphasizes the word "lease" where used in the rental agreements. For example, many rental agreements contained an "Option to Purchase" provision. Defendant refers to one sentence in another part of these agreements which advises that "lease purchase options are available for * * * [certain] machines offered for purchase in this Price List * * *." The "label" arguments of the parties, in effect, serve to cancel out each other, thus rendering these arguments inconclusive and unpersuasive. Defendant offers no other argument as to the significance, if any, of the lease purchase option aspects of the rental agreements.

25. Without expressing any opinion as to the validity of Rev.Rul. 72–407, 1972–2 C.B. 10, which involved vehicles provided for federal government use, it is noted that the situation therein is distinguishable by the taxpayer's inability to control the movement of the vehicles unlike the situation in this case. Further, there is also no indication that the taxpayer in Rev. Rul. 72–407 provided vehicles to anyone other than the federal government, whereas plaintiff's machines were available to all customers. See World Airways v. Commissioner, 564 F.2d 886, 888 (9th Cir. 1977); Stewart, IV v. United States, 40 AFTR 2d 77–5735 (D.Neb.1977) in which both courts noted that property acquired solely, or primarily, for lease to the federal government was a factor to be considered in determining whether the property was "used by" the government within the purview of the investment credit provisions of the Code.

agreements, plaintiff was to provide all maintenance, repair or replacement necessary to have machines operate effectively and efficiently. Plaintiff was required to train customer personnel. This training usually took place at plaintiff's facilities and was generally continuous because of customer's personnel turnover and the necessity for some retraining. The substance of these rental agreements were more service rather than lease oriented.

Periodically, plaintiff developed new parts or designed other technological improvements, known as "retrofits," that could be easily installed on existing machines to improve performance in terms of quality and/or output. Retrofits, when developed, were installed on existing machines even if those machines were performing satisfactorily. The installation of "retrofits," also lends support to the conclusion that plaintiff retained possession and control of the machines because such changes generally took place on plaintiff's initiative.

The customer's lack of any proprietary interest in any particular machine was evidenced by plaintiff's adherence to a policy of making like-for-like exchanges, some on its own initiative, to insure that the customer would have the use of a dependable machine. If a particular machine placed on the premises of a customer could not be kept in working order or in some way was not performing satisfactorily, plaintiff exchanged that machine for another machine of the same model type (like-for-like) at no charge to the customer. Defendant suggests that like-for-like exchanges were always initiated at its request and accomplished with its permission. The record does not support these suggestions. Obvi-

ously if a machine did not work and it was called to plaintiff's attention, it made the decision generally whether to repair it or replace it. If the machine could not be repaired, or for other reasons, e. g., customer goodwill, plaintiff would replace the machine, like-for-like. Defendant further argues that plaintiff lacked possession and control of the machines because the government could deny plaintiff access to its premises. Such an argument is not persuasive on this record. Denial of access to government premises, would have been equally possible in Rev.Rul. 68–109, supra. However the IRS concluded there that the taxpayer did have possession and control. There is no indication whatsoever of plaintiff, during the years in issue, being denied access at any time to the machines it owned. The fact that the government can control access to its buildings does not, without more, mean that an owner of property located therein loses possession thereof.

The record in this case supports a finding that plaintiff retained ownership, control, and possession of the machines under the rental agreements within the rationale of the revenue rulings discussed previously. While the conclusion reached herein is at odds with the advice IRS offered plaintiff in Rev.Rul. 71–397, IRS did not have the benefit of a trial record which shows that Rev.Rul. 71–397 was in error in concluding that the taxpayer gave up possession of the machines under the rental agreements in question.

Plaintiff's position is that it provided a copy service, an integrated package of equipment and services designed to produce copies as its end result.[26] Defendant contends that customers only contracted for a machine which they could operate them-

26. Plaintiff attacks the cryptic distinctions used by IRS in Rev.Rul. 71–397 in advising plaintiff that the rental agreements in issue were basically leases by stressing the facts developed at trial which show, plaintiff argues, that plaintiff was providing a copy service for its customers, and that the customer was not providing the service for itself. The IRS's distinctions are suspect, in any event, when applied to the cases at bar. In Ltr. 7913003, supra, where IRS found a service contract, if the pipeline

broke down no service was provided until it was repaired by the taxpayer. Yet, in Rev.Rul. 71–397, supra, where IRS found no service contract, if the copy machine broke down, no service was provided, and the customer certainly could not provide service to itself under such circumstances, until the machine was repaired or replaced by the taxpayer. This contrast, it is submitted, casts serious doubt on the viability and conceptual consistencies of the IRS's distinctions.

selves.[27] The totality of the record supports plaintiff's position that its customer wanted more than just a machine.

It is not without significance that the rental agreements contained provisions which insured that the customer would be able to obtain the desired copies. Plaintiff was required to keep the machines in good working order and make necessary inspections, adjustments, repairs and replacement of machines and machine parts without charge to the customer.[28] The customer was required to furnish a suitable electrical outlet for the machine, agreed to pay for additional supplies and accessories, expendable machine parts, and pay for repair work performed outside normal business hours. The customer did perform certain routine chores on the machine, e. g., replace paper and toner, clear simple paper jams, and clean machine exterior. However, these housekeeping tasks were most incidental and of no significance relative to the issue at hand.

The integrated nature of plaintiff's contractual arrangements was demonstrated also by the policy of like-for-like exchanges previously mentioned. Plaintiff's like-for-like exchanges indicate that machines were viewed as interchangeable, with the emphasis on insuring that the customer had the use of a working machine rather than on keeping the machine assigned to a customer in working order. Such a policy is more consistent with a service than with the typical leasing transaction which generally involves a particular piece of property.

The mode of payment in the rental agreements also suggests that plaintiff provided a service. Although minimum fees were imposed in some cases, the amount paid by the customer primarily was determined by the number of copies made. In essence therefore the customer paid for an end result, i. e., the number of copies made, and not for use of a machine for some duration.[29]

The sum total of the above factors persuades that plaintiff was providing a service to its customers under the rental agreements in issue with the machines an integral part of this service.

The question of whether a transaction should be characterized as a service or a lease or sale is one that often troubles courts. The conclusion reached herein comports with other decisions which have faced this problem, although in different factual

**27.** Defendant stresses that machine serial numbers were entered on a renewal purchase order and suggests that rental agreements were tied to particular machines. Such a suggestion is without significance (*see* note 6, *supra*). Machines were deemed fungible, and no machine was "ear-marked" for any particular customer on manufacture. A machine previously placed with a commercial customer could later be placed with a governmental or tax-exempt customer and vice versa.

**28.** The testimony at trial indicated plaintiff's obligations in this regard were important factors in the customer's decision to enter into rental agreements with plaintiff. For example, a Printing Specialist Supervisor at the State Department during the years in issue, responsible for copying machine procurement for that Department, testified that servicing of the machines was "more important than anything else," and indicated that in its absence, the Sate Department would not have entered into rental agreements with plaintiff. There was other testimony that at some government locations where a number of machines were placed an employee of plaintiff would, on customer request, remain almost full time on the premises to service the machines. It can fairly be said that the placing of copy machines by plaintiff with the government was inherent in the sale of such services, contrary to the conclusion reached by IRS in Rev.Rul. 71–397. The above testimony, and the record as a whole, persuades that plaintiff's customers did not contract solely for a machine which they could operate. Instead, it persuades that these customers contracted for an integrated package of services of which the machine was but a part.

**29.** A procurement official of one government department testified in pertinent part: "We didn't pay for a machine. We paid for the number of copies that we made in whatever mode we were in." He further testified that "* * * the more copies we made, the more the bill was each month." *See Calvert v. A–1 Bit & Tool Co.*, 256 S.W.2d 224 (Tex.Civ.App. 1953), in which the mode of payment was deemed a factor favoring treatment of a transaction as a service rather than a sale. In that case, a patented drilling tool was provided in which payment for use of the tool was based on the number of cores drilled by the tool.

contexts, and have reached similar conclusions.[30] Further, the conclusion herein is in harmony with the view that eligibility for the investment credit should be given liberal consideration in keeping with its purpose. *See Pacific Far East Line, Inc. v. United States*, 211 Ct.Cl. 71, 82, 544 F.2d 478, 484 (1976).

As indicated earlier, the purpose of the investment credit legislation was to stimulate production. The congressional assumption behind excluding property from the credit which was leased or used by governmental units was the belief that government demand was inelastic and thus not likely to result in increased production.[31] It was felt that one who supplied property primarily to the government would have no incentive to lower prices despite his ability to do so as a result of the credit. The circumstances of record suggest that the transactions between plaintiff and the government and the particular economics involved may reasonably be deemed to be within the pale of the purpose, *supra*. First, plaintiff manufactured machines for all customers, not just the government. While the government was plaintiff's largest single customer, it represented only 5 or 6 percent of the total machine population of plaintiff in place during the years in issue. Second, plaintiff had other competitors and the negotiation process each year for government business resulted in success for the company which offered, *inter alia*, the lowest prices. Finally, the record indicates that the placement of machines was affected by rental prices such that the number of machines placed in any particular year may have been affected by the rental prices involving said machines. While the record

on this particular matter is not as informative as one would like, it is sufficient to support the view that allowance of the credit in these cases would not run afoul of the congressional purpose behind the credit. Property which would otherwise qualify for investment credit should not be excluded from entitlement to the credit unless the government's demand for it, and the taxpayer's traditional primary market are outside the normal operation of economic incentives. *World Airways, Inc. v. Commissioner, supra*, 564 F.2d at 890 (Lumbard, J., concurring in part and dissenting in part).

## II

Both parties have agreed that, if plaintiff prevails on its contention that the machines were supplied as an integral part of a service, the court need not consider defendant's setoff defenses and counterclaim. Since the court has so held (in Part I, B, *supra*), those setoff defenses and counterclaim will be treated as no longer pressed. There is no occasion to deal with them separately.

## CONCLUSION OF LAW

█ Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to judgment for refund of taxes paid for the calendar years ended December 31, 1964, 1965 and 1966, together with appropriate interest as provided by law. Defendant's setoffs and counterclaim are dismissed. The full amount of recovery will be determined in further proceedings pursuant to Rule 131(c).

---

**30.** *See Charleston Transit Co. v. James*, 121 W.Va. 412, 4 S.E.2d 297 (1939); *Kaypar Corp. v. Fosterport Realty Corp.*, 1 Misc.2d 469, 69 N.Y.S.2d 313, *aff'd.* 272 App.Div. 878, 72 N.Y. S.2d 405 (1947). Defendant has cited no case in opposition to the conclusion reached herein involving a service or lease or sale issue.

**31.** This congressional assumption has no applicability to the exclusion of property provided a tax-exempt organization. The exclusion from the credit of property "used by" tax-exempt organizations was designed to prevent an in-

vestment for use in connection with an exempt function from decreasing any tax on an unrelated trade or business. *See* note 9 and text, *supra*. There is no claim here, and there is no evidence in the record, that the property plaintiff placed with tax-exempt organizations during the years in issue was not used predominantly in an unrelated trade or business. There is no basis for concluding that allowance of the credit herein would do violence to the purpose of the investment credit legislation.