T. BRUCE VEST AND E. P. VEST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vest v. Commissioner
Docket No. 19071-87
United States Tax Court
T.C. Memo 1993-243; 1993 Tax Ct. Memo LEXIS 246; 65 T.C.M. (CCH) 2830; May 27, 1993, Filed; As Corrected May 27, 1993 *246 For petitioners: Steven H. Akre. For respondent: Michael W. Bitner and David R. Reid. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in and additions to the Federal income taxes of T. Bruce and E.P. Vest: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a),
6653(a)(2)
6653(b),
6653(b)(2)
6661
(a)(1)
(b)(1)
1981
$ 17,720
$ 886
--
--  --
--  1982
65,800
-- --
$ 32,900
[1]
$ 16,450
1983
186,906
-- --
93,453
[1]
46,727
1984
50,541
2,527
[1] --  --
7,853
All section references are to the Internal Revenue Code as amended and in effect for the years in issue. After concessions, the following issues are presented for decision: (1) Whether the affidavit of a deceased individual is admissible into evidence pursuant to rule 804(b)(5) of the Federal Rules of Evidence; (2) whether petitioners are entitled to investment credit based upon their *247 investment in a Model 9800 Scanner System; (3) whether petitioners are entitled to deduct a warranty expense related to the Model 9800 Scanner System; (4) whether the gain realized from petitioners' sale of a Model 7800 Scanner System to St. Joseph's Hospital is a capital gain because the sale constituted an "involuntary conversion"; (5) whether petitioners are entitled to deduct the construction costs and retainer fee paid in connection with the construction of two buildings; (6) whether the underpayments of tax for 1982 and 1983 are due to fraud on the part of petitioner T. Bruce Vest; (7) whether the underpayments of tax for 1981 and 1984 are due to negligence; (8) whether assessment of any tax deficiency or additions to tax for 1982 is barred by the period of limitations on assessment set forth in section 6501(a); and (9) whether petitioners are liable for the addition to tax under section 6661 for substantial understatement of income tax. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The Stipulation of Facts and First Supplemental Stipulation of Facts filed by the parties are hereby incorporated in this opinion. Petitioners are husband and wife. *248 They resided in Godfrey, Illinois, at the time they filed the petition which is the subject of this case. In this opinion, references to petitioner are to T. Bruce Vest. Petitioner is a medical doctor who specializes in radiology. During 1981, he was the head of the radiology department at Wood River Township Hospital (Wood River Hospital), a political subdivision community hospital, organized under the laws of the State of Illinois. During 1981 through 1984, petitioner was employed by and provided x-ray services through Vest Medical Consultants, Ltd. (Vest Medical). Petitioner held an ownership interest in Vest Medical, but the record does not reveal how much he owned or when he owned it. Petitioner owned various x-ray equipment through a sole proprietorship, Computerized X-Ray Services (Computerized X-Ray). Transaction With Wood River Hospital
In 1981, petitioner recommended that Wood River Hospital purchase a General Electric Model 8800 Scanner System (Model 8800 Scanner) for use in its radiology department. At that time, the Model 8800 Scanner was the state-of-the-art technology in the field of "CAT scanning". In August 1982, Wood River Hospital applied to the Illinois *249 Health Facilities Planning Board for a Certificate of Need, as required for an Illinois hospital to operate a CAT scanner. The application was granted. At a meeting on October 27, 1982, the board of directors of Wood River Hospital (the board) approved the purchase and installation of a Model 8800 Scanner. In April of 1983, before Wood River Hospital had purchased the Model 8800 Scanner, General Electric (GE) began to market the Model 9800 Scanner System (Model 9800 Scanner), a technological advance from the Model 8800 Scanner. Petitioner recommended that Wood River Hospital purchase the Model 9800 Scanner in lieu of the Model 8800 Scanner. Members of the board expressed financial concerns about purchasing a more expensive piece of equipment. To circumvent those concerns, petitioner wrote a letter dated May 6, 1983, to the president of Wood River Hospital, Mr. W. Eugene Cowsert, in which petitioner proposed to purchase a Model 9800 Scanner and lease it to Wood River Hospital. He proposed a monthly lease payment of $ 18,650, consisting of $ 13,650, the monthly amount that Wood River Hospital would have paid to purchase a Model 8800 Scanner, plus an additional amount of up to *250 $ 5,000 to be paid each month only if revenues produced by the system exceeded $ 20,000 per month (50 CAT scans). Subsequently, in an undated installment contract with GE, petitioner, acting on behalf of Computerized X-Ray, agreed to purchase a Model 9800 Scanner for $ 1,060,200, plus $ 42,408 sales tax, for a total of $ 1,102,608. Petitioner agreed to pay that amount, less a downpayment of $ 111,983.62, plus a finance charge of $ 506,209.06, for a total of $ 1,496,833.44, in 83 monthly installments of $ 17,819.44 and one installment of $ 17,819.92. During 1983, it was the responsibility of the president of Wood River Hospital, Mr. Cowsert, to review all contracts on behalf of the hospital. He would ask the hospital's board of directors for its approval of any contract under which the hospital would be required to make payments in excess of $ 5,000. The chairman of the board would sign any such contract on behalf of the hospital. On April 28, 1983, Mr. George Myers, acting in his capacity as chairman of the board, and petitioner, acting on behalf of Vest Medical, entered into a Radiology Agreement, under which petitioner agreed to provide certain radiology services to the hospital. *251 The term of the Radiology Agreement was 3 years, beginning May 1, 1983, but it was terminable by either party on 90 days' notice. The board approved the Radiology Agreement at a meeting on April 28, 1983. On May 25, 1983, the board elected Mr. Dale Dickerson to replace Mr. Myers as chairman. At a meeting of the board on June 22, 1983, it agreed "to upgrade the 8800 CAT Scan to the 9800 CAT Scan as approved by the Illinois Health Facilities Planning Board". Thereafter, Mr. Dickerson, acting as chairman of the board, executed an undated document entitled Contract for Lease of 9800 GE CAT Scanner (hereinafter referred to as Contract for Lease). That document states as follows: CONTRACT FOR LEASE OF 9800 GE CAT SCANNER Computerized X-Ray Services proposes to lease to Wood River Township Hospital a GE 9800 CAT Scanner, specifications which are detailed in the accompanying contract, for a monthly installment of $ 18,635.00 for a total of eighty-four (84) months. A monthly payment of $ 13,635.00 is to be made each month and an additional amount up to $ 5,000.00 is to be made subject to monthly billing in excess of $ 20,000.00. Amounts less than the $ 5,000.00 per month may *252 be carried at 9.5% interest rate until such time that the additional amounts are paid. The monthly rate after the eighty-fourth payment will be $ 13,635.00 until such amount of deferred payment is completed. The GE 9800 Scanner would have a company warranty for twelve (12) months as per standard contract. Wood River Township Hospital would receive title to the Scanner after the payment of the equivalent of eighty-four monthly installments of $ 13,635.00 has been completed. Wood River Township Hospital would be responsible for the maintenance of the equipment and for insurance to cover the cost and protection of the equipment until such time they receive title to the equipment. Additional terms and conditions are detailed in the accompanying equipment description and installment purchase contract. Equipment is to be installed beginning the latter part of June, 1983, subject to adequate site preparation. Wood River Township Hospital agrees to provide office space for Administrative and Clerical work necessary to implement the professional management by Vest Medical Consultants, Ltd. as per prior contract with this corporation. /s/ Bruce Vest MD Bruce Vest, M.D. *253 Vest Medical Consultants, Ltd. /s/ Dale Dickerson Dale Dickerson, Ed.D Chairman, Board of Directors Wood River Township Hospital
Notwithstanding the use of the phrase "proposes to lease" in the first sentence of the above document, it is the only lease agreement between Wood River Hospital and Computerized X-Ray regarding the Model 9800 Scanner. On July 5, 1983, GE delivered to Wood River Hospital the Model 9800 Scanner that had been purchased by petitioner. During the latter part of 1983, petitioner upgraded the Model 9800 Scanner, with Wood River Hospital's approval, by adding a supplementary array processor and an additional disc drive (upgrade equipment). Computerized X-Ray purchased this equipment from GE by Installment Contract signed on October 24, 1983. The purchase of this upgrade equipment required Wood River Hospital to increase its monthly lease payments to Computerized X-Ray by $ 1,970.85 beginning in January, 1984. The board of directors of Wood River Hospital approved the upgrade equipment without written addendum to the Contract for Lease. Pursuant to the terms of the Contract for Lease, Wood River Hospital paid Computerized X-Ray Services the base *254 monthly rental of $ 13,634.92, plus the additional $ 5,000 per month (with the exception of September 1984, when Wood River Hospital incurred maintenance expenses of $ 21,533.32), and the upgrade rental of $ 1,970.85 per month (again with the exception of September 1984). The total monthly lease payment was $ 20,604.92. During 1983, petitioner and Mr. Cowsert, president of Wood River Hospital, discussed the availability of the investment credit for the Model 9800 Scanner. In the course of that conversation, Mr. Cowsert provided petitioner with written information, dealing with the so-called noncorporate lessor rules of section 46(e)(3)(B), that suggested that the investment credit was not available to petitioner for the Model 9800 Scanner. Petitioner maintained that written information in his tax files. On their 1983 Federal income tax return, petitioners claimed a regular investment credit in the aggregate amount of $ 121,000. In computing that credit, petitioners included the cost of the Model 9800 Scanner and the upgrade equipment, array processor, and disc drive, added later. Their return sets forth the following schedule of the property included in computing the tentative *255 regular investment credit for 1983: COMPUTERIZED X-RAY SERVICES
COST
ITC
THREE YEAR PROPERTY
12,000.
60%
720.
FIVE YEAR PROPERTY
1,184,402.
100%
118,442.
(sic)
OIL DRILLING PARTNERSHIPS
11,110.
100%
1,111.
T.B. & E.P. VEST
THREE YEAR PROPERTY
10,000
60%
600.
FIVE YEAR PROPERTY
2,435.
100%
243.
TOTAL INVESTMENT CREDIT
121,116.
Petitioners were not able to utilize the full investment credit of $ 121,000 claimed for 1983. They carried back $ 65,800 of the 1983 credit to 1982 and received a refund of 1982 tax in that amount. In computing the subject tax deficiencies for 1982 and 1983, respondent allowed $ 20,472 of the regular investment credit claimed by petitioners for 1983 and disallowed the remainder, $ 100,528. The notice of deficiency describes this adjustment as follows: The amount allowed for 1983 is consistent with the determination that the GE 9800 CAT Scanner and the 9800 CT Lin Array were leased during 1983 to Wood River Township Hospital, a tax-exempt entity, for a term no less than 5 years and, therefore, no qualified investment is allowable, although claimed, for those properties for 1983.
Warranty Expense
The *256 Model 9800 Scanner was covered by a factory warranty, but the record in this case does not contain the warranty. Normally, the purchase price of a Model 9800 Scanner includes a charge for a 1-year warranty covering the equipment. Occasionally, GE sells a Model 9800 Scanner without a factory warranty, and it reduces the purchase price accordingly. When a Model 9800 Scanner is purchased from GE pursuant to a monthly installment contract, GE sends monthly invoices to the purchaser. Usually, these invoices do not specify how much of the payment is attributable to the factory warranty. In this case, shortly after purchasing the Model 9800 Scanner, petitioner discussed the cost of the warranty with GE's Sales Manager, Mr. David C. Meek. Mr. Meek sent to petitioner invoices for each of the five installments payable for September 1983 through January 1984. Each of the invoices was for $ 17,819.44 but contained the words "warranty portion of monthly portion is $ 7,086.66". Petitioner paid those five invoices during 1983. On the Schedule C for Computerized X-Ray Service, filed with petitioners' 1983 income tax return, petitioners deducted $ 66,011 for repairs. Of that amount, $ 35,433 *257 is the aggregate cost of the warranty on the Model 9800 Scanner which petitioner paid during 1983, in accordance with the GE invoices (i.e., $ 7,086.66 X 5). Respondent disallowed that amount in the notice of deficiency and allowed the remaining $ 30,578 of the deduction claimed. The notice of deficiency explains the reason for the adjustment as follows: It has not been substantiated that any more than $ 30,578 is allowable for repairs for 1983.
Examination of Petitioners' 1983 Return
During the latter part of 1985, respondent assigned Revenue Agent Robert Meyer to examine petitioners' 1983 income tax return. Agent Meyer first contacted petitioner by telephone in December 1985. During that telephone conversation, Agent Meyer scheduled an appointment with petitioner for February 18, 1986. When later confirming the appointment, Agent Meyer requested that petitioner bring to the meeting copies of all leases of the Model 9800 Scanner. On February 18, 1986, Agent Meyer met with petitioner at petitioner's office. Petitioner did not produce all the documents Agent Meyer believed to be necessary for the examination. Therefore, Agent Meyer scheduled another appointment *258 with petitioner for February 20, 1986. Agent Meyer returned to petitioner's office on February 20, 1986. Again, Agent Meyer concluded that petitioner had not assembled all of the necessary records. Petitioner then left his office and returned with additional documentation. The record does not state how long petitioner was absent. Upon petitioner's return to his office on February 20, 1986, and in response to inquiry by Agent Meyer, petitioner produced a document, entitled "Operating Agreement", which petitioner said was the lease of the Model 9800 Scanner to Wood River Hospital. That document states as follows: OPERATING AGREEMENT
This is an Agreement between COMPUTERIZED X-RAY SERVICES ("Owner") and WOOD RIVER TOWNSHIP HOSPITAL ("Hospital"). WITNESSETH: WHEREAS, Owner is the owner of a General Electric CT 9800 Scanner System, along with various accessories used therewith, including a Diagnostic Console, a Multiformat Camera, a Supplementary Array Processor, an Additional Disc Drive, and 3 film cassettes (all of the foregoing items owned by Owner are hereinafter referred to as the "Scanner"); WHEREAS, Hospital desires to obtain the right to use and operate the Scanner *259 when necessary for diagnosis and treatment of its patients and therefore desires to enter into the Operating Agreement with Owner to set forth the conditions under which it will use and operate the Scanner: NOW, THEREFORE, Owner and Hospital agree as follows: 1. Hospital's Right to Use. Owner agrees that Hospital shall have the right to use and operate the Scanner whenever necessary for the diagnosis and treatment of its patients, subject, however, to supervision and control of such use by Owner. 2. Consideration. As consideration for the right to use and operate the Scanner, Hospital agrees to pay to Owner the sum of $ 20,300.00 per month each month during the term of this Agreement. Each such monthly payment shall be due on or before the first day of the month. As further consideration for such right, Hospital agrees that it will pay the cost of all maintenance of the Scanner and for insurance on the Scanner of the types and in the amounts that are satisfactory to Owner. 3. Warranty, Maintenance and Insurance. The Scanner is covered by a warranty issued by the General Electric Company for a period of one (1) year from the date the Scanner is first available *260 for use and Owner agrees to take such action as is within its power to ensure that any claims that might be covered by any warranty on the Scanner are submitted to the General Electric Company. 4. Termination. This Operating Agreement shall terminate two (2) years from August 1, 1983; provided, however, that either Owner or Hospital may terminate this Operating Agreement at any time, with or without cause, prior to the end of such two-year period by giving 90 days' written notice of intent to terminate to the other party. Until this Operating Agreement is terminated, Hospital agrees to provide, without cost to Owner, space in Hospital's facilities for maintenance and operation of the Scanner. 5. Indemnity. Hospital shall indemnify, defend, and hold harmless Owner against all actions, claims, demands, costs, damages, penalties, or expenses of any kind which may be brought or made against Owner by any person or organization whatsoever as a result of any act or neglect of Hospital in connection with its use and operation of the Scanner, the intent of this paragraph being that Owner shall incur no liability as a result of Hospital's use and operation of the Scanner. Executed *261 this 22 day of December, 1983. COMPUTERIZED X-RAY SERVICES By /s/ Bruce Vest M.D. WOOD RIVER TOWNSHIP HOSPITAL By /s/ George Myers
As shown above, the "Operating Agreement" was purportedly signed on December 22, 1983, by Mr. George Myers, the former chairman of Wood River Hospital's board on behalf of the hospital. In fact, Mr. Myers had not signed the document, and he had never seen it prior to a meeting with respondent's agents on June 19, 1986. During petitioner's conference with Agent Meyer on February 20, 1986, petitioner also produced a copy of the following document in which he purportedly proposed to donate the Model 9800 Scanner to Wood River Hospital on December 1, 1990 (the gift letter): Wood River Township Hospital Edwardsville Road Wood River, Illinois 62905 Gentlemen: I am the owner of the General Electric Model 9800 Scanner System ("Scanner"), presently located at your facilities. I would like to propose to make a gift of the Scanner to the hospital, effective on December 1, 1990. If the proposed donation is acceptable, please acknowledge as indicated below. Sincerely, /s/ Bruce Vest Bruce Vest, M.D. Accepted: /s/ George Myers Title *262 Date 12/22/83
Like the "Operating Agreement", the gift letter was purportedly signed on December 22, 1983, by Mr. George Myers on behalf of Wood River Hospital. Mr. Myers' signature on the gift letter was not made by Mr. Myers. After meeting with petitioner on February 20, 1986, Agent Meyer contacted Wood River Hospital to verify the "Operating Agreement" and to determine why the term of the lease was only 2 years. On April 23, 1986, a representative of Wood River Hospital gave Agent Meyer a copy of the Contract for Lease, under which the hospital leased the Model 9800 Scanner for a term of 84 months. Petitioner had never mentioned, or provided Agent Meyer with, a copy of the Contract for Lease. Following receipt of the Contract for Lease, Agent Meyer and petitioner had a "closing conference" during which Agent Meyer proposed to disallow the investment credit claimed by petitioners with respect to the Model 9800 Scanner. At that time, Agent Meyer assumed that both the "Operating Agreement" and the Contract for Lease had been validly executed. Petitioner insisted that only the "Operating Agreement" was valid, that the Contract for Lease was a mere negotiation, and that *263 he was entitled to investment credit on the scanner. After the closing conference, Mr. Cowsert, president of Wood River Hospital, contacted Agent Meyer and informed him that the Contract for Lease was the only agreement which Wood River Hospital had entered into concerning the Model 9800 Scanner. Subsequently, on June 19, 1986, Messrs. Cowsert and Meyers met with Agent Meyer and his supervisor, Mr. Richard Knowles. At that meeting, Mr. Myers, after having been sworn, and under no pressure from either Agent Meyer or Mr. Knowles, executed an affidavit which states as follows: I have reviewed the attached operating agreement signed by Dr. Vest and myself. From my review of this document I can state that it is certainly not my signature and I do not recall seeing this prior to today.
Mr. Knowles signed the affidavit as the person who had placed Mr. Myers under oath, and Mr. Cowsert signed as a witness. Mr. Myers died on October 20, 1988. During 1983, normal operating procedure at Wood River Hospital required every proposed contract to be reviewed by Mr. Cowsert, as president, before it was presented to the board for approval. Mr. Cowsert had never seen the "Operating *264 Agreement" until the June 19, 1986, meeting with Agent Meyer and Mr. Knowles. At Wood River Hospital, it was also standard practice to retain copies of all leases. The only lease in the Wood River Hospital files in regard to the Model 9800 Scanner was the Contract for Lease. Transaction With St. Joseph's Hospital
On December 31, 1977, petitioner, acting on behalf of Computerized X-Ray, entered into a Lease Agreement with St. Joseph's Hospital, Alton, Illinois (St. Joseph's). During 1983, St. Joseph's was operated by the Sisters of St. Francis of the Providence of God, an order of nuns of the Roman Catholic Church. Pursuant to this agreement, Computerized X-Ray leased space from St. Joseph's for the purpose of installing and operating a Model 7800 Scanner System (Model 7800 Scanner) that was owned by Computerized X-Ray. This lease was open-ended and could be terminated by either party by giving 45 days' written notice. By letter dated April 1, 1983, St. Joseph's notified petitioner of its intent to terminate the Lease Agreement as of May 16, 1983. By letter dated April 19, 1983, St. Joseph's extended the termination date to July 31, 1983. As a result, petitioner had *265 the choice of either removing the Model 7800 Scanner or selling it to St. Joseph's. Petitioner chose not to remove the Model 7800 Scanner and, by agreement dated May 13, 1983, he sold the scanner to St. Joseph's for $ 495,000, effective July 1983. Petitioners reported a gain of $ 314,189 from the sale of the Model 7800 Scanner on Form 4797, Supplemental Schedule of Gains and Losses, attached to their 1983 Federal income tax return. This form is used to report gains and losses from sales or exchanges of assets used in a trade or business and involuntary conversions. According to the Form 4797, the gain was computed by adding the amount realized from the sale, $ 495,000, to the depreciation allowed or allowable, $ 562,745, and by subtracting petitioners' cost or other basis, $ 743,565. In passing, we note that $ 495,000 plus $ 562,745, minus $ 743,565 equals $ 314,180, or $ 9 less than the gain reported. Petitioners also reported a long-term capital gain of $ 314,189 on Schedule D, Capital Gains and Losses. On that form they offset a portion of the gain with a net long-term capital loss for "partnerships, S corporations, and fiduciaries" in the amount of $ 183,224 and reported *266 the difference of $ 130,965 as net long-term capital gain. In the notice of deficiency, respondent recomputed the gain realized from the sale of the Model 7800 Scanner to St. Joseph's and determined that the amount of the gain is $ 319,144, rather than $ 314,189. Respondent also treated the gain as ordinary income, rather than as capital gain. Accordingly, respondent determined that none of the gain could be offset by the net long-term loss in the amount of $ 183,224 nor could it be reduced by the deduction of capital gains set forth in section 1202(a). Construction of a Temporary Scanner Building and Doctors Clinic
During 1984, petitioner hired Ralph Korte Construction Co. (Korte Construction) to design and construct a multi-million dollar Doctors Clinic. In October 1984, petitioner purchased a Model 9800 Scanner System (clinic scanner) for use in this clinic. At petitioner's direction, Korte Construction erected a temporary building to house the clinic scanner until the Doctors Clinic was completed. The area of this scanner building was approximately 800 square feet. Petitioner performed his work as a radiologist in the building. The cost of the building was approximately *267 $ 70,000, of which petitioner paid $ 52,230 on December 30, 1984. Petitioner caused the structure to be demolished in 1986. Petitioners deducted the amount that they paid in 1984 for the temporary building, $ 52,230, on the Schedule C, Profit or (Loss) From Business or Profession, for Computerized X-Ray that accompanied their 1984 income tax return. Respondent disallowed that deduction in the notice of deficiency for the following reason: It has not been substantiated that any amount is allowable for Temporary Building for 1984. The adjustment is represented by a nondeductible capital expenditure for which depreciation is allowable when the facility is placed into service.
Before Korte Construction began construction of either petitioner's scanner building or his Doctors Clinic, petitioner paid Korte Construction a $ 10,000 fee. This fee was a "retainer", which secured Korte Construction's initial architectural services for both the scanner building and the Doctors Clinic. The services also included advice about the location of possible construction sites, a price quote, and preparation of schematic drawings. Petitioners did not explicitly list the $ 10,000 fee as *268 a deduction on their 1984 Federal income tax return. Nevertheless, they claim that the fee was deducted on the Schedule C filed with their 1984 return for Computerized X-Ray services. The "total deductions" set forth on that schedule is "832,461". However, the individual amounts listed as deductions total $ 780,621, or $ 51,840 less. In the notice of deficiency, respondent treated the difference between the total of the deductions listed on the return and the specified total as a "computational error in return" and increased petitioners' income by that amount. OPINION 1. Admissibility of the Affidavit of Mr. George R. Myers
The first issue is whether the affidavit of Mr. George R. Myers is admissible hearsay under rule 804(b)(5) of the Federal Rules of Evidence, the residual exception to the hearsay rule. Mr. Myers executed the affidavit on June 19, 1986, approximately 28 months before his death on October 20, 1988. Rule 804(b) sets forth five exceptions to the hearsay rule which apply if the declarant is "unavailable", as defined by rule 804(a). The first four of these exceptions permit the admission of former testimony, statements made under belief of impending death, *269 statements against interest, and statements of personal or family history. rule 804(b)(1), (2), (3), and (4). The fifth exception, rule 804(b)(5), provides an additional, residual exception that is applicable in circumstances that fit none of the other four categories. To qualify for admission under the residual exception, the statement must bear "circumstantial guarantees of trustworthiness" equivalent to those found in the other exceptions. Rule 804(b)(5). In addition, a court must determine that: (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. * * * [Id.]
A "circumstantial guarantee of trustworthiness" is present when the declarant's statement is made under oath, with no pressure brought to bear on the witness to make the statement, and the declarant is "a disinterested witness -- a mere bystander, with no axe to grind." United States v. Boulahanis, 677 F.2d 586, 588 (7th Cir. 1982); *270 see also United States v. Hooks, 848 F.2d 785, 797 (7th Cir. 1988). Additionally, a circumstantial guarantee of trustworthiness is present when there exists sufficient corroboration of the statement being offered. United States v. Guinan, 836 F.2d 350, 356 (7th Cir. 1988). We find the affidavit admissible under rule 804(b)(5). Respondent has shown that the affidavit carries "equivalent circumstantial guarantees of trustworthiness" and that it is sufficiently corroborated by other evidence. It is uncontroverted that Mr. Myers signed the affidavit under oath, as a disinterested witness, and that respondent's agents exerted no pressure on him to do so. See United States v. Boulahanis, supra at 588. Petitioners' argument that these factors are vitiated by the fact that respondent's agents were the only witnesses to the affidavit fails to account for the fact that Mr. Cowsert also witnessed the document. Petitioners' argument that the affidavit is flawed to the point of being untrustworthy is without merit. Although petitioners never explicitly say so, this argument implies that the *271 affidavit could have been altered by respondent. Petitioners have introduced no evidence to support this veiled speculation. The affidavit was executed on a Treasury Department form, which contained standardized "beginning" and "end" pages. Agent Meyer satisfactorily explained that although the affidavit is two pages in length, he stated on the form that the affidavit was one page in length because the substantive portion of the statement was contained completely on one page. Even though Mr. Myers signed only the final page and not each of the two pages as the preprinted portion of the statement requires, this was a standardized form, and the "fine print" apparently was not followed as carefully as it might have been. Respondent's agents failed to delete the blank spaces in the document. However, the entire affidavit is only two sentences long, and there is nothing to suggest that an unauthorized addition was made to the affidavit. Finally, counterbalancing each of these flaws is the testimony of Agent Meyer and Mr. Cowsert, who identified the affidavit as the one they had witnessed. Respondent has also presented sufficient evidence to corroborate Mr. Myers' affidavit. See *272 United States v. Guinan, supra at 356. The affidavit states that Mr. Myers did not sign the "Operating Agreement" and, in fact, had never seen it prior to his meeting with respondent's agents. That statement is corroborated by the testimony of Mr. Eugene Cowsert, who was president of Wood River Hospital on the date of the "Operating Agreement" and who would have reviewed such an agreement. He testified that he had never seen the document prior to the time that Agent Meyer presented it to him for verification. He also testified that he conducted a search of the records of Wood River Hospital and found no copy of the "Operating Agreement", despite the hospital's business practice of maintaining copies of all contracts. As further corroboration, respondent notes that the "Operating Agreement" was purportedly signed by Mr. Myers after he had been replaced as chairman, contrary to the hospital's policy that the chairman of the board signed contracts. Moreover, respondent has proven that, contrary to petitioners' assertions, Wood River Hospital did not "unequivocally follow each and every term in the 'Operating Agreement.'" See infra pp. 51-52. *273 Finally, the affidavit satisfies the other requirements of rule 804(b)(5). The affidavit is obviously material to the issue of the validity of the "Operating Agreement." It is more probative than any other available evidence concerning whether Mr. Myers had signed the "Operating Agreement". Further, we find that the interests of justice will best be served by admission of the affidavit into evidence. 2. Investment Credit on the Model 9800 Scanner Leased to Wood River Hospital
Respondent determined that petitioners are not eligible for the investment credit claimed on their 1983 joint income tax return with respect to their investment in the Model 9800 Scanner leased to Wood River Hospital. In order to fully understand the positions of the parties with respect to this issue, it is necessary to briefly review several aspects of the investment credit as it stood during the years at issue. We note that the credit was repealed in 1990. Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11813(a), 104 Stat. 1388, 1388-536. During the years in issue, the Internal Revenue Code permitted a credit against a taxpayer's income tax liability based upon the taxpayer's *274 investment in certain depreciable property used in the taxpayer's trade or business. Sec. 38(a). As applicable to this case, the amount of the credit generally was equal to 10 percent of the "qualified investment", subject to a limitation based upon the amount of the taxpayer's tax. Sec. 46(a)(2) and (3). "Qualified investment" for a taxable year was defined to mean a certain percentage of the basis of each new "section 38 property * * * placed in service by the taxpayer during such taxable year." Sec. 46(c). The applicable percentage in the case of recovery property, such as involved in this case, was 100 percent. Sec. 46(c)(7). In general, the definition of "section 38 property" included tangible personal property and certain other tangible property of a character subject to the allowance for depreciation. Secs. 48(a)(1), 168(c). However, the definition of "section 38 property" provided a number of limitations and restrictions on the kind of property that qualified. See sec. 48(a). One such limitation declared that property used by a governmental agency or instrumentality could not be treated as section 38 property. Sec. 48(a)(5). That limitation provided as follows: *275 Property used by the United States, any State or political subdivision thereof, any international organization, or any agency or instrumentality of any of the foregoing shall not be treated as section 38 property. * * *
The regulations promulgated under that provision, section 1.48-1(k), Income Tax Regs., stated as follows: The term "property used by the United States, etc." means (1) property owned by any such governmental unit (whether or not leased to another person), and (2) property leased to any such governmental unit. Thus, for example, a data processing or copying machine which is leased to any such governmental unit would be considered as property used by such governmental unit. Property leased by another person to any such governmental unit or leased by such governmental unit to another person is not section 38 property to either the lessor or the lessee, and in either case the lessor may not elect under § 1.48-4 to treat the lessee of such property as having purchased such property for purposes of the credit allowed by section 38. This paragraph shall not apply to property leased on a casual or short-term basis to any such governmental unit. [Emphasis *276 added.]
Therefore, property leased to a government entity or instrumentality could not be treated as section 38 property, unless the lease was "casual" or "short-term". Id.
In addition to the above rules dealing with the definition of section 38 property, individuals were not eligible for the credit on property leased to others unless they met certain other rules applicable to noncorporate lessors, which were set forth in section 46(e)(3). That paragraph provided as follows: (3) NONCORPORATE LESSORS. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) *277 exceeds 15 percent of the rental income produced by such property. * * *
For purposes of subparagraph (B), in the case of any recovery property (within the meaning of section 168), the useful life shall be the present class life for such property (as defined in section 168(g)(2)).
The above-cited Code sections and regulations applied only to leases and not to service contracts. Property provided to governmental entities pursuant to a service contract was considered to be "used" by the service provider, and not by the governmental entity. See Xerox Corp. v. United States, 228 Ct. Cl. 406, 656 F.2d 659, 671-675 (1981) (per curiam); Musco Sports Lighting, Inc. v. Commissioner, T.C. Memo. 1990-331, affd. 943 F.2d 906 (8th Cir. 1991); Smith v. Commissioner, T.C. Memo. 1989-318; Rev. Rul. 68-109, 1968-1 C.B. 10. Thus, property provided to a governmental entity under a service contract did not lose its section 38 property status through application of section 48(a)(5) and the regulations promulgated *278 thereunder. In addition, because such property was not "leased", it qualified for the investment credit without satisfying the additional noncorporate lessor rules of section 46(e)(3). See Xerox Corp. v. United States, supra at 677-678; Smith v. Commissioner, supra.
In this case, we have found that the Contract for Lease is the operative agreement between petitioner and Wood River Hospital regarding the Model 9800 Scanner. Accordingly, we examine each of petitioners' arguments in light of that agreement. a. Whether the Contract Is a Service Contract or a Lease
Petitioners assert that the agreement with Wood River Hospital is a service contract, as defined in section 7701(e), rather than a lease, and therefore, the scanner qualifies for investment credit without satisfying either the section 48(a)(5) rules and accompanying regulations regarding property used by governmental units, or the noncorporate lessor rules of section 46(e)(3). Respondent argues that the scanner does not qualify for investment credit because the Contract for Lease is a lease and not a service contract. Respondent also takes issue with petitioners' assertion *279 that section 7701(e) applies in determining whether the Contract for Lease is a lease or a service contract. According to respondent, preexisting case law, and not section 7701(e), is controlling. We agree with respondent. Congress enacted section 7701(e) in the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 31(e), 98 Stat. 494, 518-521. However, the following transitional rule, DEFRA sec. 31(g)(4)(a), 98 Stat. 522, limits the applicability of section 7701(e): (A) IN GENERAL -- The amendments made by this section shall not apply with respect to any property leased to a tax-exempt entity * * * if -- (i) on or before November 1, 1983, there was significant governmental action with respect to the project or its design, and (ii) the lease to the tax-exempt entity is pursuant to a written binding contract entered into before January 1, 1985, which requires the tax-exempt entity to be the lessee of the property.
The lease in this case meets both of the above requirements. First, Wood River Hospital, a political subdivision community hospital, operated as a government entity, and the Model 9800 Scanner was delivered to Wood River Hospital in July 1983. *280 Thus, there had obviously been significant governmental action taken regarding the lease of the Model 9800 Scanner before November 1, 1983. Second, although the Contract for Lease is undated, the testimony in this case proves that it was executed before the January 1, 1985, deadline. Therefore, section 7701(e) is not applicable in determining whether the Contract for Lease is a service contract. We turn to preexisting case law to determine whether the Contract for Lease is a service contract. Smith v. Commissioner, T.C. Memo. 1989-318, involved high-tech medical equipment, a CAT scanner and a special diagnostic camera, each of which had been either leased or provided to a hospital under a service contract. In that case, the Court outlined the following factors to be considered in distinguishing a lease from a service contract: (1) which party has the use and possession or control of the equipment; (2) which party operates the machine; (3) whether the tax-exempt organization pays for the use of the machine for some duration or, instead, pays based upon the number of procedures executed; and (4) whether the equipment is part of a broader, integrated *281 system of equipment and services. [Id.]
See also Musco Sports Lighting, Inc. v. Commissioner, 943 F.2d 906, 908 (8th Cir. 1991), affg. T.C. Memo. 1990-331, where the Court of Appeals for the Eighth Circuit approved this four-factor test as "efficient and effective". In Xerox Corp. v. United States, 228 Ct. Cl. 406, 656 F.2d 659 (1981), the Court of Claims also addressed this issue. It found that the distinction between a lease and a service contract hinged on an examination of two broad areas: (1) The nature of the possessory interest retained by the taxpayer, and (2) the degree to which property supplied to a customer is a component of an integrated operation in which the taxpayer has other responsibilities. Id. at 674. In examining the nature of the taxpayer's possessory interest, the court examined four secondary factors: (a) The retention of ownership by the taxpayer, (b) retention of possession and control of the property by the taxpayer, (c) retention of the risk of loss by the taxpayer, and (d) reservation of the right to remove the property and replace *282 it with comparable property. Id.
Under both Smith v. Commissioner, supra, and Xerox Corp. v. United States, supra, the Contract for Lease fails to qualify as a service contract. The Model 9800 Scanner was installed within Wood River Hospital's physical plant, and petitioner released control of the machine to Wood River Hospital. Petitioner did not retain the right to use the Model 9800 Scanner to provide CAT scan services on behalf of any other entity. In addition, the Contract for Lease provides that the Model 9800 Scanner would become property of Wood River Hospital at the end of the 7-year lease term. The Model 9800 Scanner was operated by employees of petitioner's businesses, but this service was provided through a separate "Radiology Agreement" which had been executed before the parties reached agreement regarding the Model 9800 Scanner. The Radiology Agreement was of 3 years' duration, but it contained a 90-day cancellation clause. Cancellation of the Radiology Agreement would have no legal effect on the status of the Contract for Lease. Thus, Wood River Hospital was free to replace *283 the personnel who operated the Model 9800 Scanner, after giving 90 days' notice. The hospital paid a flat monthly lease fee for the machine. This fee was supplemented by an additional amount, $ 5,000, required to be paid for each month in which the hospital performed over 50 scans. As discussed above, the purpose of this contingent amount was to allay the fears of directors of Wood River Hospital that the machine might not prove profitable. Petitioners introduced no evidence that the Contract for Lease and the Radiology Agreement were interdependent; thus, we find that there was no integrated system of equipment and services. In light of the above, we find that the Contract for Lease is a lease and not a service contract. As such, it is a lease to a governmental entity, and the property covered under the lease cannot be treated as "section 38 property" unless the lease qualifies as a "short-term" lease. Sec. 1.48-1(k), Income Tax Regs. Furthermore, the Contract Lease must also meet the requirements of the noncorporate lessor rules set forth in section 46(e)(3). b. Whether the Contract for Lease Is a "Short-Term" Lease and Is For a Term Which Is Less Than 50 Percent of *284 the Useful Life of the Property
Petitioners argue that even if the Operating Agreement is held to be a lease, rather than a service agreement, they are nevertheless entitled to the investment credit claimed on the Model 9800 scanner. They argue that the Operating Agreement is a "short-term" lease for purposes of section 48(a)(5), and that it satisfies the limits imposed under noncorporate lessor rules regarding the term of the lease. In this connection, they argue that the "term of the Operating Agreement is less than 50 percent of the property's useful life, which is 9 years. I.R.C. 168(i)(2); Rev. Rul. 87-56, I.R.B. 1987-42." (Emphasis added.) Petitioners' argument fails to deal with the possibility that we would find, as we have, that the operative lease agreement between Wood River Hospital and Computerized X-Ray is the Contract for Lease and not the Operating Agreement. Under the Contract for Lease, the term of the agreement is 84 months, i.e., 7 years. Thus, accepting petitioners' contention that the useful life of the Model 9800 Scanner is 9 years, it is clear that the Contract for Lease is neither a "short-term" lease for purposes of *285 section 48(a)(5), nor is it a lease the term of which is less than "50 percent of the useful life of the property", as required by section 46(e)(3)(B). Accordingly, we sustain respondent's determination that petitioners are not entitled to the investment credit claimed on their 1983 joint income tax return with respect to the Model 9800 Scanner leased to Wood River Hospital. 3. Deductibility of First Year Warranty Expenses Under Section 162(a)
Respondent determined in the notice of deficiency that petitioners are not entitled to deduct $ 35,433, labeled "repairs" on their 1983 return, as an ordinary and necessary business expense under section 162(a). Respondent asserts that this expenditure must be capitalized under section 263(a). Petitioners bear the burden of disproving respondent's determination on this issue. Rule 142(a). (Hereinafter all Rule references are to the Tax Court Rules of Practice and Procedure.) Section 162(a) states, "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 1.162-4, Income Tax Regs., provides: The cost of incidental *286 repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense * * *
Section 263(a)(1) provides that no deduction shall be allowed for "Any amount paid out for * * * permanent improvements or betterments to increase the value of any property or estate." Section 1.263(a)-1(b), Income Tax Regs., provides that expenditures for which a deduction shall not be allowed include "amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment * * *. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures." Petitioners contend that they made five payments of $ 17,819.44 on the Model 9800 Scanner in 1983 and that each of those payments included $ 7,086.66 for the monthly cost of a 1-year warranty. Thus, they argue that they paid $ 35,433 (5 x $ 7,086.66) of the total 1-year warranty expense in 1983 and that this amount is deductible as "ordinary and necessary" expense under section 162(a). Petitioners argue that the cost of *287 the warranty is a current expense rather than a capital expenditure. They assert that the warranty covered repairs of the scanner for the 1-year period only, and that it did not prolong the life or enhance the value of the Model 9800 Scanner within the meaning of section 1.263(a)-1(b), Income Tax Regs. Petitioners also argue that the cost of repairs to the scanner, in the absence of a warranty, would be deductible under section 1.162-4, Income Tax Regs. Thus, they argue, the warranty cost for 1983 should be deducted currently under section 162(a). Respondent contends that petitioners are not entitled to deduct the subject $ 35,433 in 1983 because they did not pay the warranty expense during the 1983 tax year, but rather, paid it over the entire 7-year financing period of the scanner. In the alternative, respondent argues that even if the warranty expense can be segregated and was paid during 1983, it must be capitalized under section 263(a), rather than deducted. Respondent relies on Spritzer v. Commissioner, T.C. Memo. 1988-347, in which this Court stated: "expenditures such as warranty expenses that prolong the life or enhance the value of existing *288 assets are capital in nature." Respondent asserts that under Spritzer, warranty expenses are capital in nature. We find that petitioners have failed to meet their burden of proof on this issue. Petitioners did not introduce the warranty agreement into evidence. The record contains only vague testimony from a GE employee regarding the extent of the warranty coverage. Based on the record in this case, we do not know what the warranty covered. Thus, even if we agreed with petitioners that $ 35,433 of the payments made during 1983 is allocable to the factory warranty on the scanner, we do not know what GE undertook to do for that sum. We infer from petitioners' failure to introduce the warranty into evidence that it would not have been favorable to petitioners. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Accordingly, petitioners have failed to prove that the warranty coverage "neither materially [added] to the value of the property nor appreciably [prolonged] its life". Sec. 1.162-4, Income Tax Regs.
Furthermore, petitioners' position that they are entitled *289 to a current deduction in 1983 for a portion of the monthly payments for the Model 9800 Scanner fails to account for the fact that petitioners included the entire cost of the scanner, $ 1,060,200, in computing the allowance for depreciation claimed on the scanner for 1983, $ 151,078. That amount was computed as follows: Cost of scanner
$ 1,060,200 Less 1/2
investment credit
<53,010>
Adjusted basis
1,007,190 15 percent of adjusted basis
151,078 Thus, for depreciation purposes, petitioners capitalized the entire cost of the Model 9800 Scanner, including the amount allocable to the warranty. They treated the scanner as "5-year property" within the meaning of section 168(c)(2)(B), and they reduced their basis in the scanner by 50 percent of the investment credit, as required by section 48(g). 4. Whether Petitioners' Sale of Their Model 7800 Scanner Constitutes an Involuntary Conversion
As discussed above, petitioners computed the amount of gain realized from the sale of the Model 7800 Scanner to St. Joseph's Hospital to be $ 314,189, and they reported that amount on Schedule D of their 1983 joint income tax return as long-term capital gain. On Schedule D, *290 petitioners offset the gain of $ 314,189 with long-term capital losses of $ 183,224, and they deducted 60 percent of the remainder pursuant to section 1202(a). Thus, they included $ 52,386 in income as a result of the transaction ($ 314,189 less $ 183,224 times 40 percent). Respondent determined that the amount of the gain realized from the sale is $ 319,144, i.e., $ 4,955 more than the amount reported by petitioners. Respondent also determined that the gain is an ordinary gain, rather than a capital gain, and is fully includable in income. Petitioners argue that the action taken by St. Joseph's Hospital in terminating its lease of the Model 7800 Scanner from Computerized X-Ray amounted to the exercise of the power of requisition or the threat thereof by a quasi-governmental entity. Accordingly, petitioners argue that the gain realized from such transaction in 1983 qualifies as gain from the involuntary conversion of property used in a trade or business, and should be treated as capital gain pursuant to section 1231. Petitioners conclude their argument with the following: Consequently, the disposition of St. Joseph's C.A.T. Scanner should be treated as involuntary conversion *291 under Section 1231, rather than as a Section 1245 gain on the sale of equipment used in a trade or business and subject to ACRS recapture.
In passing, we note that petitioners do not contend that the gain realized from the sale to St. Joseph's should not be recognized pursuant to section 1033. Generally, under that section, if the taxpayer replaces property which was involuntarily converted into money by purchasing other property similar or related in service or use within a 2-year period, then the gain realized from the involuntary conversion is recognized only to the extent that the amount realized exceeds the cost of the replacement property. Sec. 1033(a). We also note that petitioners do not take issue with respondent's determination that the gain realized from the transaction is $ 319,144, rather than $ 314,189, the amount reported. As a general matter, we agree with respondent that the phrase "power of requisition or condemnation or the threat or imminence thereof", as used in section 1231(a), requires a taxpayer to show that the property was taken against the will of the taxpayer by some public or quasi-public entity exercising the power of eminent domain or threatening *292 to use such power. See Koziara v. Commissioner, 86 T.C. 999, 1006-1007 (1986), affd. 841 F.2d 1126 (6th Cir. 1988); Dorothy C. Thorpe Glass Manufacturing Corp. v. Commissioner, 51 T.C. 300, 305 (1968); see also Dear Publication & Radio, Inc. v. Commissioner, 31 T.C. 1168, 1174 (1959), affd. 274 F.2d 656 (3d Cir. 1960). Respondent may also be correct in arguing that petitioners' proof fails to show that St. Joseph's Hospital is such a public or quasi-public entity and that it exercised the power of eminent domain in this case. However, we see no reason to address that issue. It is clear that respondent's adjustment must be sustained regardless of whether the sale of the scanner to St. Joseph's constitutes an involuntary conversion within the meaning of section 1231(a). In the notice of deficiency, respondent determined that the gain realized from petitioner's sale of the scanner to St. Joseph's is ordinary gain, as opposed to capital gain. This determination is based on the fact that the scanner is personal property "which is or has *293 been property of a character subject to the allowance for depreciation" and, thus, qualifies as "section 1245 property" as defined by section 1245(a)(3). Therefore, pursuant to section 1245(a)(1), petitioners must recognize as ordinary income the lesser of the depreciation taken on the property, $ 562,745, or the gain on its sale, $ 319,144. In this case, section 1245(a)(1) requires that the excess of the amount realized from the sale, $ 495,000, over the adjusted basis of the property, $ 175,856, or $ 319,144, "shall be treated as ordinary income". Petitioners argue that the sale of the scanner qualifies as capital gain because the sale was an involuntary conversion within the meaning of section 1231(a). Implicit in this argument is the proposition that section 1245 does not apply to a "section 1231 gain". Petitioners are in error. It is clear that section 1245 applies to involuntary conversions. Section 1245(a)(1)(B)(i) makes specific reference to "a sale, exchange, or involuntary conversion". Thus, section 1245 applies to the gain realized upon disposition of property in an involuntary conversion, and it requires recapture of depreciation, except to the extent that any *294 gain realized is not recognized in whole or in part under section 1033. See sec. 1245(b)(4). In this case, as mentioned above, petitioners do not contend that section 1033 applies. Therefore, section 1245 requires petitioners to treat the gain recognized from the disposition of the Model 7800 Scanner as ordinary gain to the extent of the depreciation taken on the property, even if the disposition qualifies as an involuntary conversion. 5. Deductibility of 1984 Construction Costs and Retainer Fee
In the notice of deficiency, respondent determined that petitioner's payment of $ 52,230 for construction of a "temporary structure" to house his Doctors Clinic CAT Scanner and his payment of $ 10,000 to Korte Construction as a "preliminary design fee" are not currently deductible under section 162(a) as ordinary and necessary business expenses. Sec. 1.263(a)-2(d), Income Tax Regs.
Petitioners contend that the payment of $ 52,230 to Korte Construction on December 30, 1984, for construction of the "temporary structure" to house his Doctors Clinic Scanner is fully deductible in 1984. They assert that section 263(a)(1) which states that "No deduction shall be allowed for * * * Any *295 amount paid out for new buildings" does not apply because, according to petitioners, the temporary structure was not part of the Doctors Clinic, it had a useful life of less than 1 year, it was never depreciated, and it was necessary to petitioner's profession. Petitioners state that restrictive covenants with the former owner of the land required petitioner to destroy the structure, and that he actually did so in 1986. Respondent contends that this cost is not deductible in 1984, but must be capitalized as required by section 263(a)(1). Respondent asserts that the "temporary structure" was a building, and thus, under the plain language of section 263(a)(1), the cost of its construction is not deductible as a current expense. Respondent points out that the building cost approximately $ 70,000 to construct, was 800 square feet in area, housed a piece of high-tech medical machinery worth over $ 1 million, and was used by petitioner and his staff to provide radiology services. We sustain respondent's determination on this point. The temporary structure was a "new building", and the costs incurred in erecting the building fall squarely within the language of section 263(a)(1), which *296 provides that no deduction shall be allowed for any amount paid out for "new buildings". The statute is clear, and it makes no exception for erection of buildings with predetermined, finite lives. Moreover, in this case, the record shows that petitioner paid the amount at issue, $ 52,230, in December of 1984 and that the building was demolished sometime during 1986. Thus, through this expenditure, petitioner acquired an asset which had a useful life that extended substantially beyond 1984. See INDOPCO, Inc. v. Commissioner, 503 U.S.    ,    , 112 S. Ct. 1039, 1044-1045 (1992). The recovery of the amounts paid through depreciation or as a loss is a separate question that is not presented here. Petitioners contend that the $ 10,000 "preliminary design fee" paid to Korte Construction was currently deductible in 1983. They assert that the fee was unrelated to the architectural fees paid for the Doctors Clinic, which they concede were capital expenditures. Petitioners argue that the fee compensated Korte Construction for locating a suitable site for the Doctors Clinic and generating a "concept drawing" for that structure. Respondent asserts *297 that under section 263(a)(1) and section 1.263(a)-2(d), Income Tax Regs., this expense is capital in nature. Respondent contends that the fee was actually a retainer which petitioner paid to begin the process of designing and building the Doctors Clinic. Thus, the fee must be capitalized as part of the cost of construction of the Doctors Clinic. We hold for respondent. Although petitioners claim that this expense is unrelated to the construction of the Doctors Clinic, we find that the site location and early architectural services performed by Korte Construction were inherently related to the construction of the Doctors Clinic. Further, as a representative of Korte Construction testified, this fee was a retainer for its architectural and construction services for the clinic project. The retainer did not solely ensure that Korte Construction would locate a site and produce "concept drawings". Korte Construction would not proceed with any portion of the project until petitioner paid the fee. 6. Whether the Underpayments for 1982 and 1983 are Due to Fraud
Respondent determined that for 1982 and 1983 petitioner T. Bruce Vest is liable for the addition to tax for fraud *298 "under section 6653(b), 6653(b)(1)". Respondent also determined that for 1983 petitioner T. Bruce Vest is liable for the addition to tax for fraud under section 6653(b)(2). Respondent did not determine in the notice of deficiency that petitioner T. Bruce Vest is liable for the section 6653(b)(2) addition for 1982 but made a claim therefor in respondent's answer. Petitioner Evelyn P. Vest is not liable for any fraud additions because respondent determined that "none of the fraud is due to fraud on part of Evelyn P. Vest". At the outset, we note that Congress amended section 6653(b) in 1982 to add the interest-addition feature contained in section 6653(b)(2). Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 325(a), 96 Stat. 324, 616. This amendment applies to taxes the last day for payment of which (without regard to any extension) is after the date of enactment of TEFRA, September 3, 1982. TEFRA sec. 325(b), 98 Stat. 616. Therefore, the fraud additions set forth in section 6653(b)(1) and (2) are both applicable to taxes for calendar years 1982 and 1983. Section 6653(b)(1) provides an addition to tax equal to 50 percent of the entire underpayment *299 for the year if any part of the underpayment is due to fraud. To prevail as to this addition, respondent must prove that some part of the underpayment for each year was due to fraud. Section 6653(b)(2) provides an addition to tax "equal to 50 percent of the interest payable under section 6601 * * * with respect to such portion of the underpayment described in [section 6653(b)(1)] which is attributable to fraud." Accordingly, section 6653(b)(2) applies only to those portions of the underpayment that were due to fraud. Respondent determined that the portion of the underpayment for 1983 that is attributable to the investment credit claimed on petitioner's investment in the Model 9800 Scanner leased to Wood River Hospital is due to fraud. Respondent also determined that the underpayment for 1982, which was brought about by the carryback of the 1983 investment credit, is entirely due to fraud. Respondent determined that these underpayments are due to fraud on the part of petitioner T. Bruce Vest. An underpayment of tax is due to fraud if it results from the taxpayer's specific intent to evade a tax believed to be owing. E.g., Wilson v. Commissioner, 76 T.C. 623, 633 (1981), *300 modified 77 T.C. 324 (1981). Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The existence of fraudulent intent is a factual question to be decided on the basis of an examination of the entire record. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. Fraud may never be presumed but must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Because direct proof of a taxpayer's intent is rarely available, however, fraud may be established by circumstantial evidence, which includes conduct calculated to mislead or conceal. Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Beaver v. Commissioner, supra at 92-93. Fraud may also be inferred from a taxpayer's entire course of conduct with respect to the transaction in question. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); *301 Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). A deficiency is due to fraud if it is caused by the carryback or carryover of a fraudulent loss from another year. Arc Electrical Construction Co. v. Commissioner, 923 F.2d 1005, 1010 (2d Cir. 1991), revg. on other grounds T.C. Memo. 1990-30; Toussaint v. Commissioner, 743 F.2d 309, 310-313 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Ghidoni v. Commissioner, T.C. Memo. 1991-284; Hall v. Commissioner, T.C. Memo. 1990-244. Respondent argues that petitioner fabricated the "Operating Agreement" and attempted to convince respondent's agent of its validity. In addition, respondent contends that petitioner's status as a highly educated medical doctor and businessman, his avocation as an "amateur code reader" with a well-developed knowledge of the tax law, and the forewarning that *302 Mr. Cowsert gave petitioner that the investment credit was not available for the Model 9800 Scanner are probative circumstantial evidence that petitioner had the specific intent of evading payment of tax that he believed that he owed. Petitioner contends that his behavior in regard to the "Operating Agreement" in no way indicates fraudulent intent. Petitioner asserts that he operated under the honest assumption that the Contract for Lease was a "mere negotiation" and that the "Operating Agreement" was the true contract between the parties. He asserts that he personally showed the "Operating Agreement" to Mr. Myers, who took it from him. According to petitioner, the signed "Operating Agreement" was later returned to him through hospital mail, and he never had any reason to assume that it was not valid. Therefore, petitioner argues, even if the "Operating Agreement" is not valid, his reliance on it was reasonable and does not support respondent's fraud claim. Petitioner further argues that although he is highly educated and is a student of the Internal Revenue Code, he is no expert in Federal tax law. He also argues, contrary to respondent's characterization of his behavior, *303 that he was fully cooperative with respondent's agent and made no false or misleading statements concerning the subject investment credit. We agree with respondent that a portion of the 1983 underpayment and all of the 1982 underpayment are due to fraud. Respondent has presented clear and convincing evidence that petitioner fabricated the "Operating Agreement" and falsely presented it to respondent's agent in 1986 in an attempt to substantiate the investment credit claimed in 1983 with respect to his investment in the Model 9800 Scanner leased to Wood River Hospital. The maximum term of the "Operating Agreement" is "two (2) years from August 1, 1983". On the other hand, the term of the Contract for Lease is "Eighty-four (84) months". That 84-month period exceeds the maximum term permitted under the noncorporate lessor rules of section 46(e)(3)(B), "50 percent of the useful life of the property". Similarly, a term of that length would not be considered a "casual or short-term" lease for purposes of section 48(a)(5). The testimony of Mr. Cowsert at trial and Mr. Myers' affidavit prove that the only agreement between Wood River Hospital and Computerized X-Ray was the Contract for *304 Lease, and that the responsible officers of the hospital had never seen the "Operating Agreement" until several years after its purported signing, when respondent's agent presented them with a copy of it. In his affidavit, Mr. Myers not only states that the signature affixed to the document is not his, but also that he had never seen the "Operating Agreement" before it was presented to him by Agent Meyer. Similarly, Mr. Cowsert, the president of Wood River Hospital during the subject period, testified that he had never seen the "Operating Agreement" until Agent Meyer brought it to his attention. A search of the hospital's files produced no record that any such contract ever existed, despite the hospital's practice of keeping copies of all such documents. Furthermore, the "Operating Agreement" bears the purported signature of Mr. Myers, who was no longer chairman of the board at the time of its purported signing, rather than the signature of Mr. Dickerson, who was the chairman at the time. We also note that, contrary to petitioner's assertion, the conduct of Wood River Hospital during 1983 conforms to the Contract for Lease and not to the "Operating Agreement". This is shown *305 by the fact that the dollar amount of the monthly payments made by Wood River Hospital to petitioner for the Model 9800 Scanner conformed to the Contract for Lease. That document requires a payment of $ 13,635 per month, plus an additional $ 5,000 in any month in which monthly billing exceeded $ 20,000, for a total of $ 18,635. An unwritten addendum, which covered the cost of the upgrade equipment to the Model 9800 Scanner, added $ 1,970 per month to Wood River Hospital's cost, and brought the total to $ 20,605. Wood River Hospital's books reflect that the hospital paid $ 20,604.92 per month to Computerized X-Ray, except for certain amounts paid for a maintenance contract and for additional maintenance. On the other hand, the "Operating Agreement" requires Wood River Hospital to pay petitioner a flat fee of $ 20,300 per month for use of the Model 9800 Scanner and its upgrades. No mention is made in the "Operating Agreement" that any portion of the monthly payment was contingent on the number of procedures billed. Thus, contrary to petitioner's assertion that the hospital's payments to him adhere to the "Operating Agreement", they actually reflect nearly perfect faithfulness to *306 the terms of the Contract for Lease, as amended to account for the upgrade equipment. Based upon the above, we find that petitioner falsely presented the "Operating Agreement" to respondent's agent in 1986 because he knew that otherwise the credit claimed on his 1983 return would not be allowed. Thus, we infer that in filing petitioners' 1983 joint income tax return, which claimed investment credit with respect to the Model 9800 Scanner leased to Wood River Hospital, and in carrying back a portion of the credit to 1982, petitioner T. Bruce Vest intended to evade tax which he believed to be due. Respondent has proven by clear and convincing evidence that petitioner acted with fraudulent intent in regard to the investment tax credit claimed on the Model 9800 Scanner in 1983 and carried back to 1982. Therefore, we find that the addition to tax under 6653(b)(1) applies to the underpayments for 1982 and 1983. We also find that the addition to tax under section 6653(b)(2) applies to the entire underpayment for 1982 and to the portion of the underpayment for 1983 attributable to the fraudulently claimed investment credit. These findings make it unnecessary to consider respondent's *307 alternative position that the addition to tax for negligence under sections 6653(a) applies to 1982 and 1983. 7. Whether the Underpayments for 1981 and 1984 are Due to Negligence
Respondent determined that petitioners are liable for the addition to tax for negligence pursuant to "section 6653(a), (a)(1)" for tax years 1981 and 1984. Respondent determined that the entire underpayment for 1981 and a portion of the underpayment for 1984 are due to negligence. Respondent also determined that petitioners are liable for the addition to tax for negligence pursuant to section 6653(a)(2) for 1984. In the notice of deficiency, respondent determined that $ 31,412 of the underpayment for 1984 is subject to the addition to tax under section 6653(a)(2). On brief, respondent asserts that this is the amount of the underpayment attributable to two adjustments totaling $ 83,138, "income from business" ($ 81,938) and "excess itemized deductions" ($ 1,200). Respondent did not determine that petitioners are liable for the addition to tax under section 6653(a)(2) for 1981 but made a claim therefor in respondent's answer. Respondent's answer asserts that the entire deficiency in income taxes *308 for 1981 was due to petitioners' negligence or intentional disregard of the rules and regulations and, thus, respondent asserts that section 6653(a)(2) is applicable to the entire underpayment for 1981. At the outset, we note that Congress amended section 6653(a) in 1981 to add the interest addition contained in section 6653(a)(2). Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 722(b), 95 Stat. 172, 342. Congress applied the amendment to taxes the last date for payment of which is after December 31, 1981. Id. Therefore, the negligence additions set forth in section 6653(a)(1) and (2) are both applicable to taxes for calendar years 1981 and 1984. Section 6653(a)(1) provides an addition to tax equal to 5 percent of the underpayment, if any part of the underpayment for the year is due to negligence or intentional disregard of respondent's rules or regulations. In order to prevail on their contention that the additions under section 6653(a)(1) are not applicable, petitioners must prove that no part of the underpayment for 1981 or 1984 is due to negligence or intentional disregard of respondent's rules or regulations. Rule 142(a). Section 6653(a)(2) provides an addition *309 to tax equal to 50 percent of the interest payable under section 6601 with respect to any portion of the underpayment which is attributable to negligence or intentional disregard of rules or regulations. In regard to 1984, petitioners bear the burden of proving that respondent erroneously determined the negligence addition under section 6653(a)(2). Rule 142(a). In order to prevail, petitioners must prove that the underpayment attributable to the two adjustments which formed the basis of respondent's determination, the income from business and excess itemized deductions, were not due to negligence or intentional disregard of rules and regulations. In regard to 1981, respondent claimed the addition to tax under section 6653(a)(2) in the answer. Thus, respondent bears the burden of proving that the addition to tax under section 6653(a)(2) applies to 1981. Rule 142(a); Hyslep v. Commissioner, T.C. Memo. 1988-289; Welch v. Commissioner, T.C. Memo. 1960-163, revd. on other grounds 297 F.2d 309 (4th Cir. 1961). Accordingly, respondent must prove the specific portion of the underpayment for 1981 *310 that is due to petitioners' negligence or intentional disregard of rules and regulations. For purposes of section 6653(a)(1) and (2), negligence means "'a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). A taxpayer is not negligent if a complex legal issue is involved and his or her position is arguable, Yelencsics v. Commissioner, 74 T.C. 1513, 1533 (1980), or if the dispute presents "substantial issues of law and fact", Scott v. Commissioner, 61 T.C. 654, 663 (1974). The deficiency for 1984, as determined in the notice of deficiency, is based upon adjustments that increase petitioners' taxable income by $ 133,003. Each of those adjustments is set out below, along with the manner in which it was resolved in these proceedings: Conceded by
Conceded by
1984 Adjustments
Petitioners
Respondent
Disputed
a.
Computation error
$ 51,840 --    $ 42,956.15
$ 8,883.85
c.
Sales or exchanges
of property
(9,845)
($ 9,845.00)
--   --    d.
Income from business
Depreciation
5,126 --    5,126.00
--    Interest on
indebtedness
12,216 2,111.00 10,105.00
--    Temporary building
52,230 --    --   52,230.00
Maintenance on scanner
9,866 3,203.69 6,662.31
--    Depreciation
2,500 1,250.00 1,250.00
--    e.
Loss from partnership
7,870 7,870.00 --   --    f.
Excess itemized
deductions
1,200 1,200.00 --   --    133,003 5,789.69 66,099.46
61,113.85
*311 For For Resolved at Trial
Respondent
Petitioner
a.
Computation error
--  8,883.85
--    (8.883.85)
d.
Income from business
-- 52,230.00
--    ($ 52,230.00)
Temporary Building
133,003
66,903.54
66,099.46
--     100.0000%
50.3023% 49.6977% 0.0000%  Respondent determined that the five adjustments that comprise item d., income from business, in the aggregate amount of $ 81,938, and the adjustment listed above as item f., excess itemized deductions, in the amount of $ 1,200 were due to negligence. Thus, respondent determined that $ 83,138 of the total adjustment was due to petitioners' negligence. We sustain respondent's determination as to adjustments totaling $ 50,149.69 (i.e., $ 66,903.54 less item a., $ 8,883.85, and item e., $ 7,870). Thus, in computing the addition to tax under section 6653(a)(1) for 1984, the issue is whether the underpayment attributable to adjustments totaling $ 50,149.69 was due to petitioners' negligence or intentional disregard of rules and regulations. Petitioners assert that they used due care and diligence in filing their returns for 1981 and 1984, based on a good faith interpretation of *312 the tax law and that they are not liable for any of the negligence additions determined by respondent. They claim that their 1981 and 1984 returns involved complex transactions wherein there existed substantial issues of law and fact. However, beyond these bare assertions, petitioners offered no evidence as to their lack of negligence regarding any of the adjustments determined by respondent. Therefore, we find that petitioners have failed to carry their burden of proof. Thus, the section 6653(a)(1) addition applies to the entire underpayment in petitioners' 1984 tax and the section 6653(a)(2) addition applies to the underpayment attributable to $ 50,149.69 of the total adjustments of $ 66,903.54 sustained by the Court. For 1981, the deficiency determined in the notice of deficiency is based primarily on a reduction of the amount of investment credit that petitioners had claimed as a carryback from 1984. Petitioners had claimed investment credits on their 1984 return, in the aggregate amount of $ 101,103. Of that amount, they used $ 40,681 to offset 1984 tax, and they carried back $ 60,142 to 1981. The record does not readily reveal petitioners' treatment of the remaining *313 $ 280 (i.e., $ 101,103, less $ 40,681 and $ 60,142). In the subject notice of deficiency, respondent reduced the amount of the credit carryback to 1981 from $ 60,142 to $ 44,762, a reduction of $ 15,380. This reduction is due to the fact that petitioners' taxable income for 1984 was increased by reason of the adjustments described above. This increased the amount of the credit that petitioners were entitled to use in 1984 and decreased the amount available as a carryback. Respondent also increased the minimum tax for which petitioners are liable for 1981 from $ 22,812 to $ 25,152, an increase of $ 2,340. The basis for this increase is not readily evident from the record. The deficiency determined by respondent for 1981, $ 17,720, is the sum of the reduction in investment credit, $ 15,380, and the increase of minimum tax, $ 2,340. As to the addition of tax under section 6653(a)(1), it is evident that the increase of petitioners' taxable income for 1984 which was brought about by the adjustments described above, some of which were due to petitioners' negligence, also caused a reduction of the investment credit carryback of 1981. Therefore, we find that some part of the underpayment *314 for 1981 is due to petitioners' negligence and that the addition to tax under section 6653(a)(1) is applicable to the entire underpayment for 1981. As to the addition to tax under section 6653(a)(2), respondent has failed to prove that the entire underpayment for 1981 is due to negligence or intentional disregard of rules and regulations. In the case of the underpayment attributable to the increase in the minimum tax, $ 2,340, we find that respondent has failed to prove that it was due to petitioners' negligence. In the case of the underpayment attributable to the decrease in the investment credit carryback from 1984, $ 15,300, we find it is due to petitioners' negligence in the same proportion as the increase in petitioners' income for 1984 is due to petitioners' negligence (i.e., a fraction of which $ 50,149.69 is the numerator and $ 66,903.54 is the denominator). 8. Whether Assessment of Tax Deficiency and Additions to Tax for 1982 Is Barred by the Period of Limitations on Assessment
Section 6501(a) sets forth the general rule that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed." Ordinarily, if a notice of deficiency *315 is issued within 3 years after the return is deemed to have been filed, the running of the period of limitations is suspended. Sec. 6503(a)(2). On the other hand, if a notice of deficiency is not issued within that period, then as a general rule the assessment and collection of any tax which may be owing for the year are barred. E.g., Hyde v. Commissioner, 64 T.C. 300, 305 (1975). The bar of the period of limitations is an affirmative defense. Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981). Taxpayers, like petitioners, who raise this defense must prove the date on which the return was filed, and the date on which the period of limitations expired. The Commissioner then has the burden of proving that any extension of the period of limitations is applicable. Id.
Section 6501 permits a number of exceptions to the general period of limitations. One exception, contained in section 6501(c)(1), applies in the case of a false or fraudulent return with the intent to evade tax. The exception permits the Commissioner to assess the tax at any time. Another exception, contained in section 6501(j), *316 authorizes the Commissioner to assess a deficiency arising out of an erroneous credit carryback at any time within the period the Commissioner could assess a deficiency for the year in which the credit arose. See sec. 6501(h); Neri v. Commissioner, 54 T.C. 767, 771 (1970); secs. 301.6501(h)-1, 301.6501(j)-1, Proced. & Admin. Regs. In this case, petitioners' joint 1981 and 1982 income tax returns were filed more than 3 years before respondent issued the notice of deficiency. However, petitioners concede that the subject notice is timely as to 1981 because the entire deficiency for that year is attributable to the carryback of investment credit from 1984, and the period of limitations for 1984 had not expired at the time respondent issued the notice of deficiency. See sec. 6501(j)(1). As to 1982, petitioners argue that respondent failed to prove that the period of limitations was extended under any of the exceptions to the limitations period. We disagree. As discussed above, the entire deficiency for 1982 is attributable to the carryback of the investment credit claimed in 1983 in regard to petitioner's investment in the Model 9800 Scanner leased *317 to Wood River Hospital. In as much as the notice of deficiency was timely in regard to 1983, section 6501(j) permits assessment of 1982 tax based on the erroneous credit carryback from 1983. We need not consider respondent's position that assessment of the 1982 tax determined in the notice of deficiency is also timely under section 6501(c)(1) because petitioners' 1982 return is a "false or fraudulent return with the intent to evade tax". 9. Additions for Understatement of Income Tax
In the notice of deficiency, respondent determined that there was a substantial understatement of income tax for petitioners' 1982, 1983, and 1984 tax years, within the meaning of section 6661. Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a). Section 6661(a) imposes an addition to tax equal to 25 percent of any underpayment attributable to a substantial understatement of income tax which is assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). In the case of a noncorporate taxpayer, an understatement of income tax is a "substantial understatement" if it exceeds the greater of *318 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). In this case, petitioners made no argument of any kind regarding the section 6661 additions determined by respondent. For example, they claimed neither that there is substantial authority for the tax treatment of the items on their returns, nor that they adequately disclosed the relevant facts regarding their treatment of disallowed tax items. See sec. 6661(b)(2)(B). Accordingly, we sustain respondent's determination of the additions to tax under section 6661. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. Fifty percent of interest on underpayment.↩